**ENVIRONMENTAL PROTECTION INFORMATION CENTER, a nonprofit corporation, Plaintiff,**

v.

**PACIFIC LUMBER COMPANY, a Delaware corporation; Scotia Pacific Company LLC, a Delaware corporation; Environmental Protection Agency, a federal agency; and Christine Todd Whitman, in her capacity as EPA Administrator, Defendants.**

No. C 01–2821 MHP.

United States District Court,
N.D. California.

Jan. 23, 2004.

Michael R. Lozeau, Earthjustice Legal Defense Fund, Stanford, CA, Mark A. Rigau, U.S. Dept of Justice Environmental & Natural Resources Div., San Francisco, CA, Deborah A. Sivas, Earthjustice Legal Defense Fund, Stanford, CA, for Environmental Protection Information Cener.

Frank Shaw Bacik, John A. Behnke, Carter Behnke Oglesby & Bacik, Ukiah, CA, Christopher J. Carr, Stoel Rives LLP, San Francisco, CA, Bruce Stewart Flushman, Edgar B. Washburn, Stoel Rives LLP, San Francisco, CA, for Pacific Lumber Co.

### Order Motion to Dismiss

PATEL, Chief Judge.

On July 24, 2001, plaintiff Environmental Protection Information Center ("EPIC"), a non-profit environmental organization, brought a citizen-suit action under section 505(a) of the Clean Water Act ("CWA"), 33 U.S.C. § 1365(a), against Pacific Lumber Company and Scotia Pacific Lumber Company (collectively "PALCO"), the Environmental Protection Agency ("EPA"), and Christine Todd Whitman as EPA Administrator.[1] EPIC's complaint alleges that PALCO violated the CWA, the Porter–Cologne Act, and California's Unfair Competition Law, Cal. Bus & Prof. Code § 17200 et seq., when it discharged pollutants without a · CWA permit. For these alleged violations, EPIC seeks declaratory and injunctive relief, civil remedies, and restitution.

On August 16, 2001, the court denied EPIC's motion for a temporary restraining order. PALCO and EPA subsequently filed separate motions to dismiss the action, and EPIC, in response, filed an amended complaint on September 24, 2001, adding a third claim challenging the non-point source provision of the relevant regulation. On June 6, 2003, the court denied EPA's motion to dismiss and denied PALCO's motion to dismiss in part, concluding that EPIC could pursue a claim under the Administrative Procedures Act ("APA") in this court and that EPIC's claim was not time-barred. On October 13, 2003, the court denied EPIC's motion for summary judgment on its third claim for relief, granting PALCO's and EPA's cross-motions and construing the relevant EPA regulation in a manner consistent with germane federal law.

Now before the court is PALCO's motion to dismiss EPIC's remaining claims under Federal Rule of Civil Procedure 12(b)(6). The court has considered the parties' arguments fully, and for the reasons set forth below, the court rules as follows.

### BACKGROUND [2]

In its opinion of October 14, 2003, the court set forth in significant detail the

---

1. Pursuant to Federal Rule of Civil Procedure 25(d)(1), Michael Leavitt, new Administrator of EPA, automatically replaces his predecessor in this suit. See Fed.R.Civ.P. 25(d)(1).

2. Unless otherwise noted, this fact recitation is culled from the parties' moving papers.

factual and procedural histories of this action. To give context and shape to the court's consideration of PALCO's motion to dismiss, the court repeats much of this background here.

## I. *Underlying Facts*

At the heart of this litigation is Bear Creek, a brook situated several miles upstream of Scotia, California. A tributary of the Eel River, Bear Creek creates a watershed that covers 5500 acres of land throughout Humboldt County, California. Pacific Lumber Company and its wholly owned subsidiary, defendant Scotia Pacific Lumber Company, own some ninety-five percent of the land in the Bear Creek watershed, much of which PALCO uses for logging.[3]

According to EPIC, substantial logging activity in the watershed area—primarily that performed by PALCO—has spurred a dramatic increase in the amount of sediment deposited into Bear Creek. Before significant logging began, EPIC claims, Bear Creek's sediment deposit peaked at approximately 8,000 tons per year; after logging practices commenced, sediment deposit climbed to 27,000 tons per year. This sediment increase, EPIC alleges, has a specific source: PALCO's timber harvesting and construction of unpaved roads. According to EPIC, PALCO's logging activity creates a deleterious environmental process. First, EPIC notes, timber harvesting removes vegetation from the ground surface, making soil more susceptible to erosion and landslides; construction of unpaved roads then exposes more soil, which, in turn, further destabilizes slopes. The effect of timber harvesting and road construction, EPIC contends, is to expose far more destabilized soil than is environmentally sustainable. When it rains, EPIC explains, the rain water carries the exposed silts and sediments—as well as other pollutants, like pesticides and diesel fuel—into culverts, ditches, erosion gullies, and other alleged channels. From these various water channels, silts, sediments, and pollutants flow directly into Bear Creek.

According to an April 1998 study conducted by PALCO consultants, sediments and pollutants pile into Bear Creek and its tributaries at no fewer than 179 specific watershed points. Among other channels, pollutant-laden water flows through 156 hillside culverts and 5.5 miles of roadside ditches, all of which drain directly into stream-crossing culverts. The consequences of this system, EPIC contends, are predictable and environmentally adverse: Beneficial uses of Bear Creek are substantially diminished; e.g., fish are significantly less able—if able at all—to use the creek as a nesting and rearing habitat. Worse still, EPIC adds, PALCO's present and future timber harvest plans promise the construction of additional roads and the digging of additional culverts, all of which could increase the amount of sediment, silt, and other pollutants deposited into Bear Creek. PALCO neither holds nor has applied for any relevant permits for these sites, sites EPIC contends should be regulated as "point sources" under the CWA.

## II. *Statutory and Regulatory Background*

With the goal of "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters," Congress enacted the CWA in 1972. 33 U.S.C. § 1251(a) (originally codified as the Federal Water Pollution Control Act, 62 Stat. 1155); *see Association to Protect Hammersley v. Taylor Res., Inc.*, 299 F.3d

---

**3.** Both Pacific Lumber and Scotia Pacific Lumber Company are Delaware corporations; both maintain principal places of business in Scotia, California.

1007, 1016 (9th Cir.2002) (noting that, in 1972, "Congress passed the Clean Water Act amendments, 33 U.S.C. §§ 1251–1387, to respond to environmental degradation of the nation's waters"); *Pronsolino v. Nastri*, 291 F.3d 1123, 1126 (9th Cir.2002) (observing that prior federal water pollution regulation "had proven ineffective"). Built on a "fundamental premise" that the unauthorized "discharge of any pollutant by any person shall be unlawful," *Natural Resources Defense Council ("NRDC") v. EPA*, 822 F.2d 104, 109 (D.C.Cir.1987) (citing 33 U.S.C. § 1311(a)), the CWA "establishes a comprehensive statutory system for controlling water pollution." *Association to Protect Hammersley*, 299 F.3d at 1009 (citation and internal quotation marks omitted). This broad statutory scheme includes, *inter alia*, a National Pollutant Discharge Elimination System ("NPDES") for regulation of pollutant discharges into the waters of the United States. *See* 33 U.S.C. §§ 1311(a), 1342(a). Under the NPDES, permits may be issued by EPA or by States that have been authorized by EPA to act as NPDES permitting authorities. *See* 33 U.S.C. § 1342(a)-(b); *see also Environmental Def. Ctr., Inc. v. United States Envtl. Prot. Agency*, 345 F.3d 832, 841 (9th Cir.2003) ("[P]ollution dischargers must comply with "technology-based pollution limitations (generally according to the 'best available technology economically achievable,' or 'BAT' standard)."); *NRDC v. EPA*, 822 F.2d at 110 (noting that, when necessary, water quality-based standards may supplement technology standards). California has been so authorized.[4]

Not all pollutants or pollution sources fall under the purview of the NPDES. Under the CWA, "discharge of pollutant" is defined as "any addition of any pollutant to navigable waters from any *point source.*" 33 U.S.C. § 1362(12)(A) (emphasis added). The CWA's and NPDES's focus, then, trains largely on pollutant discharges from "point sources," a term the Act defines as:

> any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.

*Id.*, at § 1362(14); *see also id.* at § 1362(6) (defining "pollutant" broadly to include substances ranging from rock and sand to industrial, municipal, and industrial wastes).

The CWA distinguishes "point sources" from "nonpoint sources." The NPDES recognizes—and functions on the basis of—this distinction, requiring permits only for such "point source" emissions. *See, e.g., League of Wilderness Defenders v. Forsgren*, 309 F.3d 1181, 1183 (9th Cir. 2002) ("Point source pollution is distinguished from nonpoint source pollution, which is regulated in a different way and does not require [the NPDES] type of permit."). Unlike "point sources," "nonpoint sources" are regulated indirectly:

---

4. EPA delegated its permit-issuing authority to California on May 14, 1973. *See* 39 Fed. Reg. 26,061 (July 16, 1974). California administers its portion of the NPDES program through the Porter–Cologne Water Quality Control Act ("Porter–Cologne Act"), Cal. Water Code § 13000 *et seq.*, which, in turn, created a group of Regional Water Quality Control Boards charged with the responsibility of issuing Waste Discharge Requirements ("WDRs"). By every relevant measure, WDRs are equivalent to CWA permits, and in every relevant sense for this action, the Porter–Cologne Act imports its definitions from the CWA, including those for "pollutants," "discharge," and "point source." *See* Cal. Water Code § 13373.

The CWA directs EPA to disseminate information regarding nonpoint pollution sources, *see* 33 U.S.C. § 1314(f), but it is often through state management programs that "nonpoint sources" are monitored and controlled. *See Oregon Natural Desert Ass'n v. Dombeck,* 172 F.3d 1092, 1096–97 (9th Cir.1998), *cert. denied,* 528 U.S. 964, 120 S.Ct. 397, 145 L.Ed.2d 310 (1999).

A. *Regulation of Silvicultural Sources and Activities*

Following the passage of the CWA, EPA promulgated regulations that exempted certain categories of discharges—namely "[u]ncontrolled discharges composed entirely of storm runoff" and some "[d]ischarges of pollutants from agricultural and silvicultural activities"—from NPDES permit requirements. *See* 40 C.F.R. § 125.4 (1973). Close to twenty years ago, these silviculture-related regulations spurred a round of litigation in federal court, as NRDC challenged the exemptions in the United States District Court for the District of Columbia. *See NRDC v. Train,* 396 F.Supp. 1393, 1395 (D.D.C.1975), *aff'd sub nom., NRDC v. Costle,* 568 F.2d 1369 (D.C.Cir.1977). As NRDC read the CWA, EPA did not have the authority to exempt entire categories of point sources from CWA regulation. *Id.* The district court agreed, invalidating the regulation. *Id.* at 1396.

In response to this 1975 court decision, EPA promulgated a new silvicultural-source regulation in 1976. *See* 41 Fed. Reg. 24,709, 24,711 (June 18, 1976). Originally codified as 40 C.F.R. section 124.85, the 1976 iteration of the regulation defined the term "silvicultural point source" in a brief comment, offering counter-examples of nonpoint sources:

> [Silvicultural point source] does not include nonpoint source activities inherent to forest management such as nursery operations, site preparation, reforestation and subsequent cultural treatment,

thinning, prescribed burning, pest and fire control, harvesting operations, surface drainage, and road construction and maintenance from which runoff results from precipitation events.

*Id.* EPA repromulgated this regulation in 1980. *See* 45 Fed.Reg. 33,290, 33,446–47 (May 19, 1980). When it did so, it folded the definitional comment into the text of the regulation itself, making only slight changes to the pertinent language. *Id.*

The current regulation governing silvicultural point sources is identical to the recodified 1980 version. In significant part, the current regulation defines a "[s]ilvicultural point source" as:

> any discernible, confined, and discrete conveyance related to rock crushing, gravel washing, log sorting, or log storage facilities which are operated in connection with silvicultural activities and from which pollutants are discharged into waters of the United States. *The term does not include* non-point source silvicultural activities such as nursery operations, site preparation, reforestation and subsequent cultural treatment, thinning, prescribed burning, pest and fire control, harvesting operations, *surface drainage, or road construction and maintenance from which there is natural runoff.*

40 C.F.R. § 122.27(b)(1) (emphasis added). In its October 14 opinion, the court assessed the scope and meaning of section 122.27, finding the regulation to be consistent with—and controlled by—related provisions of the CWA.

B. *1987 Amendments on Municipal and Industrial Stormwater Discharges*

In 1987, Congress amended the CWA to include a section on municipal and industrial stormwater discharges. *See* Pub.L. No. 100–4, 101 Stat. 7 (1987) (codified as 33

U.S.C. § 1342(p)). Among other things, this provision—popularly labeled "section 402"—mandates that permits be obtained for stormwater discharges "associated with industrial activity," for stormwater discharges from municipal storm sewer systems, and for stormwater discharges that contribute to water quality violations or are otherwise "significant contributor[s] of pollutants." 33 U.S.C. § 1342(p)(2). In addition, subsection (6) of section 402(p) requires the EPA to designate other sources of stormwater pollution and, in turn, to "establish a comprehensive program to regulate" these discharges. *Id.* at § 1342(p)(6).

For the discharges identified in section 402(p)(2), EPA has issued two batches of regulations. *See* 55 Fed.Reg. 47,990 (Nov. 16, 1990); 64 Fed.Reg. 68,722 (Dec. 8, 1999). The first set, issued in 1990 and often referred to as the "Phase I" regulations, prompted a number of legal challenges; these "Phase I" regulations were, for the most part, deemed valid by the Ninth Circuit. *See, e.g., American Mining Cong. v. EPA,* 965 F.2d 759, 762 (9th Cir.1992); *NRDC v. EPA,* 966 F.2d 1292, 1295 (9th Cir.1992). The second set, issued in 1999 and generally labeled the "Phase II" regulations, reached the remaining sources in section 402(p)(6). *See* 64 Fed.Reg. 68,722 (Dec. 8, 1999). This second set of regulations also produced a number of legal challenges, and, once again, the regulations largely were upheld by the Ninth Circuit. *See, e.g., Environmental Def. Ctr.,* 344 F.3d at 840, 841.

C. *Proposed 1999 Amendment to Silviculture Regulation*

In 1999, hoping to "modify [the EPA's] current interpretation of the term 'point source' with respect to discharges associated with silviculture," EPA proposed a revision to its 1976 silviculture regulation. *See* 64 Fed.Reg. 46,058, 46,077 (Aug. 23, 1999) (noting that the proposed changes aimed to bridge a "regulatory gap in coverage" for "a discrete category of 'non-point sources' excluded from the opportunity for regulation under the NPDES permitting program"). In this proposed revision, EPA intended to leave unchanged the first sentence of the 1976 regulation; as a result, the section's list of four types of silvicultural sources considered to be point sources would be left intact. *Id.*

But the proposed revision did not aim to leave the second sentence—viz., the sentence identifying nonpoint source activity—of the 1976 regulation in place. *See* 64 Fed.Reg. at 46,088. Rather, the revision proposed removal of the section's entire second sentence, inserting in its stead a sentence granting EPA and authorized States the opportunity, on a case-by-case basis, to designate particular stormwater discharges from silvicultural activities as point sources subject to NPDES permit requirements. *Id.* (presenting the revised text as: "This term also includes discharges composed entirely of storm water from silvicultural activities that are designated under 40 CFR 122.26(a)(1)(v) as requiring a 402 permit."). Two silvicultural sources were targeted specifically by this proposed revision: one, those silvicultural sources identified in the Phase I stormwater discharge regulations as contributors to violations of water quality standards; and, two, those silvicultural sources identified in the Phase I stormwater discharge regulations as "significant contributor[s]" of pollutants to a body of water. *Id.* (requiring a designation under section 122.26(a)(1)(v), 40 C.F.R. § 122.26(a)(1)(v)); *see* 33 U.S.C. § 1342(p)(2)(E) (granting EPA the authority to require a permit for such discharges).

These proposed silvicultural-source revisions appeared in conjunction with comprehensive EPA rulemaking on the establishment of "Total Maximum Daily Loads"

("TMDLs"). *See* 64 Fed.Reg. 46,012 (Aug. 23, 1999). A TMDL, put simply, defines the maximum amount of a pollutant that can be discharged—i.e., "loaded"—into a certain body of water from all sources, whether "point," "nonpoint," or natural background. *See Dioxin/Organochlorine Ctr. v. Clarke*, 57 F.3d 1517, 1520 (9th Cir.1995). TMDLs function as a part of the CWA's multi-step pollution control system. As a part of CWA compliance, States are required to identify bodies of water that do not meet water quality standards, even where technology-based pollution controls have been placed on relevant point sources. *See* 33 U.S.C. § 1313(d). After cataloging these bodies of water, States must then establish TMDLs for those bodies, submitting a list of waters and respective TMDLs to EPA for review. *Id.*

In shaping its 1999 revisions, EPA initially proposed that its case-by-case designation of silvicultural point sources be employed only when limitations on discharges were needed to achieve a particular TMDL. *See* 64 Fed.Reg. at 46,088. After considering comments on the proposal, however, EPA opted to retain the second sentence of section 122.27(b)(1) as promulgated in 1976. *See* 65 Fed.Reg. 43,586, 43,652 (July 13, 2000). The kind of case-by-case determination of point sources contemplated by the revision was thus rejected.

### D. *Judicial Review Under the Clean Water Act*

Read in connection with the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, the CWA creates a two-pronged jurisdictional scheme: For certain claims against EPA, jurisdiction vests exclusively and originally in the circuit courts; these claims include challenges to certain actions by EPA Administrators, e.g., "approving or promulgating any effluent limitation or other limitation under [four enumerated sections of the Act, including section 301] and 'issuing or denying any permit under [section 402].'" 33 U.S.C. § 1369(b)(1)(E)-(F). For other challenges to EPA actions, jurisdiction resides in the district courts, and actions may be brought either as citizen suits under section 505(a) or as APA claims on the basis of federal question jurisdiction. *See* 33 U.S.C. §§ 1365(a); 28 U.S.C. § 1331; *Oregon Natural Res. Council v. United States Forest Serv.*, 834 F.2d 842, 852 n. 16 (9th Cir.1987).

### III. *Procedural History*

On July 24, 2001, EPIC brought a citizen-suit action under section 505(a) of the Clean Water Act ("CWA"), 33 U.S.C. § 1365(a), against PALCO, EPA, and then-EPA Administrator Christine Todd Whitman. Seeking declaratory and injunctive relief, civil remedies, and restitution, EPIC's complaint alleges that PALCO violated the CWA, the Porter–Cologne Act, and California's Unfair Competition Law, Cal. Bus & Prof.Code § 17200 *et seq.*, when it discharged pollutants without a CWA permit.

On August 16, 2001, the court denied EPIC's motion for a temporary restraining order. PALCO subsequently moved to dismiss the action, basing its motion in part on EPA silvicultural regulation; EPIC then filed an amended complaint on September 24, 2001, appending a third claim challenging, pursuant to the APA, the nonpoint source provision of the regulation. On October 23, 2001, EPIC asked the California entity responsible for issuing CWA permits for the Bear Creak watershed area to issue permits for "Pacific Lumber's sediment- and herbicide-laden discharges, especially from culverts, drainage ditches, gullies, and logging-induced erosion channels." *See* Lozeau Dec., Exh. A at 1. The North Coast Regional Water

Quality Control Board ("Regional Board") denied EPIC's request approximately two weeks later, expressly citing EPA's interpretation of section 122.27 and EPA's attendant discussion of its decision not to promulgate the proposed 1999 regulation. *See* Lozeau Dec., Exh. B at 1 (citing 65 Fed.Reg. 43,586, 43,651 (July 13, 2000)).

On June 6, 2003, the court denied EPA's motion to dismiss and denied PALCO's motion to dismiss in part, concluding that EPIC could pursue a claim under the Administrative Procedures Act ("APA") in this court and that EPIC's claim was not time-barred. On October 14, 2003, the court denied EPIC's motion for summary adjudication on its third claim for relief, granting EPA's and PALCO's cross-motions for summary adjudication and reading 40 C.F.R. section 122.27 in a manner consistent with the governing provisions of the CWA. Now before the court is PALCO's motion to dismiss EPIC's remaining claims.

*LEGAL STANDARD*

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir.2001). Because Rule 12(b)(6) focuses on the "sufficiency" of a claim—and not the claim's substantive merits—"a court may [typically] look only at the face of the complaint to decide a motion to dismiss." *Van Buskirk v. Cable News Network, Inc.,* 284 F.3d 977, 980 (9th Cir.2002). If "a district court considers evidence outside the pleadings" when deciding a Rule 12(b)(6) motion, the court "must normally convert the 12(b)(6) motion into a [Federal Rule of Civil Procedure] 56 motion for summary judgment, and it must give the nonmoving party an opportunity

to respond." *United States v. Ritchie,* 342 F.3d 903, 907 (9th Cir.2003).

Under Rule 12(b)(6), "unless it appears beyond doubt that plaintiff can prove no set of facts in support of her claim which would entitle her to relief," a motion to dismiss must be denied. *Lewis v. Telephone Employees Credit Union,* 87 F.3d 1537, 1545 (9th Cir.1996) (citation omitted); *see also Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (permitting dismissal for failure to state a claim only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"). When assessing a Rule 12(b)(6) motion, the court must accept as true "all material allegations of the complaint," and all reasonable inferences must be drawn in favor of the non-moving party. *See, e.g., Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 337–38 (9th Cir.1996) (citation omitted). Dismissal is proper under Rule 12(b)(6) "only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Navarro,* 250 F.3d at 732 (citing *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir.1988)).

*DISCUSSION*

The basic premise of PALCO's[5] motion to dismiss is that, however defined, the pollution sources identified in EPIC's first and second claims do not require NPDES permits. If the sources are "non-point sources," PALCO contends, the sources fall outside the scope of the NPDES by definition; if, by contrast, the sources are "point sources," the sources are nevertheless a type of discharge sources the CWA and EPA have excluded from NPDES permitting mandates. Either way, PALCO concludes, PALCO's decision not to secure

---

**5.** EPA has filed a non-opposition to PALCO's motion to dismiss, appending a short memorandum in support. Almost without exception, EPA's memorandum maps the lines of

PALCO's motion, presenting a handful of arguments essentially coterminous with PALCO's.

permits for Bear Creek discharge sources is legally sustainable. And either way, EPIC's remaining claims fail to state a ground on which relief can be granted.

■ PALCO's motion seems, at first blush, to depend on a misreading of EPIC's two remaining claims. In pertinent part, EPIC's complaint alleges that PALCO has violated—and continues to violate—various provisions of the CWA through its unlawful discharge of pollutants into Bear Creek. *See* First Am. Compl., ¶¶ 38–54;[6] 33 U.S.C. §§ 1311(a), 1342. Far from failing to state a facially tenable legal claim under the CWA, EPIC's complaint contends that PALCO, on its Bear Creek site, uses a myriad of unpermitted (and, thus, unlawful) culverts, drainage ditches, and other "point source"-like conduits to discharge stormwater and pollutants. *Id.* at ¶¶ 38–48; *cf. also* Compl., ¶¶ 31–34. The CWA proscribes precisely this kind of conduct; under the terms of the CWA, then, EPIC's complaint would seem to overcome the Rule 12(b)(6) hurdle without more.

But as PALCO reads the pertinent law, the CWA sections supposedly informing EPIC's complaint actually preclude legal remedy. Section 402(p) of the CWA, PALCO contends, places discharges of the type EPIC targets outside the ambit of the NPDES and exempts such sources from the otherwise applicable CWA permit requirements. No matter how EPIC posits its claims, PALCO concludes, section 402(p) allows precisely the kind of non-permitted discharging PALCO purports to perform; since the discharges are composed of "stormwater," and since the dis-

charges are not "industrial" or "municipal" in nature, the NPDES simply does not, as PALCO understands it, control.

The court is mindful that not all discharges require permits under the CWA. Where a discharge is otherwise in compliance with—or excused by—the CWA, that discharge may not be *de facto* unlawful, even if not shielded by an NPDES permit. *See* 33 U.S.C. § 1311(a). According to PALCO, section 402(p) of the CWA provides such an exemption here, absolving PALCO of its NPDES permit obligations for all of the Bear Creek discharge sources. *See* 33 U.S.C. § 1342(p). Titled "Municipal and industrial stormwater discharges," section 402(p) provides:

(1) General rule

Prior to October 1, 1994, the Administrator or the State (in the case of a permit program approved under this section) shall not require a permit under this section for discharges composed entirely of stormwater.

(2) Exceptions

Paragraph (1) shall not apply with respect to the following stormwater discharges:

(A) A discharge with respect to which a permit has been issued under this section before February 4, 1987.

(B) A discharge associated with industrial activity.

(C) A discharge from a municipal separate storm sewer system serving a population of 250,000 or more.

*See* 33 U.S.C. § 1342(p). As PALCO reads it, section 402(p) requires permits

---

**6.** EPIC's first claim alleges that PALCO's unpermitted discharge of pollutants runs afoul of section 301; EPIC's second claim alleges that PALCO's failure to apply for an NPDES permit under section 402 derogates a separate CWA duty. Inasmuch as the two claims focus on the same geographic area, the two are plainly related. But inasmuch as the two claims depend on separate provisions of the CWA, claim one and claim two retain distinct legal viability. In arguing that the two claims are redundant, PALCO tacitly asks the court to merge section 301 and section 402 into one CWA provision. The court will not do so, and the court will not find EPIC's first two claims legally identical.

only for particular kinds of stormwater discharge sources—e.g., sources related to "industrial" or particular "municipal" activity—none of which apply here. *See* 33 U.S.C. § 1342(p); 40 C.F.R. § 122.26.

Section 402(p) does, as PALCO suggests, assign permitting obligations to a select subset of potential stormwater-discharge sources. *Id.* (targeting a particular type of municipal and industrial sources). But section 402(p) does not, as PALCO implies, apply to all pollution sources in the first instance. As the language of the CWA and Ninth Circuit caselaw make clear, section 402(p) is not the only CWA section imposing duties and obligations on pollution dischargers; both section 301(a) and 402(a), for example, posit pollution-related mandates on putative polluters, including that these polluters obtain NPDES permits for "point source" pollutant discharges. *See, e.g.,* 33 U.S.C. § 1342(a); *id.* at § 1311. As the language of the statute and the Ninth Circuit caselaw also make clear, two threshold inquiries govern the applicability of section 402(p): one, whether the relevant discharges are "composed *entirely* of stormwater," *see* 33 U.S.C. § 1342(p) (emphasis added); and, two, whether the relevant discharges are "cur-

rently [and properly] unregulated." *See Environmental Defense Center,* 344 F.3d at 840. PALCO's motion elides both of these threshold questions, ignoring the import of related CWA sections and presupposing that section 402(p) applies. Indeed, neither of section 402(p)'s threshold requirements are satisfied here.

To begin, PALCO errs to suggest that EPIC's complaint targets discharges "composed *entirely* of stormwater." 33 U.S.C. § 1342(p) (emphasis added); *see also* 64 Fed.Reg. 68,781 ("... the authority to designate remaining *unregulated discharges composed entirely of stormwater* for regulation ....") (emphasis added). In relevant part, EPIC's complaint alleges that PALCO's Bear Creek drainage system utilizes a number of "point sources"—whether culverts, drainage ditches, other conduits to discharge—to redirect stormwater *and pollutants* (i.e., something not "composed entirely of stormwater") into Bear Creek. *See, e.g.,* First Am. Compl., at ¶¶ 38–54. Nowhere does EPIC claim that the discharges consist "entirely" and exclusively of stormwater. On its face, then, EPIC's complaint does not satisfy the "entirely of stormwater" element of section 402(p)'s "general rule." [7]

---

7. PALCO has acknowledged as much, conceding that the discharges at issue do contain non-water elements. But PALCO argues nevertheless that the "composed entirely of stormwater" portion of section 402(p) is satisfied, contending, in the process, that the language of the section does not mean—or means something in addition to—what it plainly says. Unless Congress meant to regulate every discrete discharge that somehow mixes with rainwater (even those coming from private gardens), PALCO argues, the "composed entirely of stormwater" term must include even those discharges containing noxious and toxic chemicals; as long as the discharged pollutants mix with some amount of rainwater, PALCO avers, and as long as the pollutants do not emerge from an archetypical pollution "source" (e.g., an industrial pipe), the discharge should be considered to

be "composed entirely of stormwater," well within the scope of section 402(p). The court cannot agree. Loath as the court is to read statutory terms unreasonably—e.g., to read "entirely" as synonymous with "not completely"—the court is equally unwilling to provide potential polluters with a "stormwater"-based excuse for non-permitted discharge of pollutants. Were the court to accept PALCO's interpretation of the "entirely of stormwater" term, the court would condone more than an odd, contraindicated construction of plain statutory language; the court would condone polluters' decisions not to seek NPDES permits in all contexts in which the discharged pollutants mixed with rainwater, however small the rainwater quantity. The deleterious consequences of—and perverse incentives inherent in—PALCO's logic are too substantial to countenance, and the

Nor does EPIC's complaint meet the requirement that the discharges be otherwise "unregulated." In the preamble to the Phase II regulations, the EPA noted that

> EPA and authorized States continue to exercise the authority to designate remaining *unregulated discharges* composed entirely of stormwater for regulation on a case-by-case basis.... In [the Phase II rule], ... individual instances of stormwater discharge might warrant special regulatory attention, but do not fall neatly into a discrete, predetermined category.

64 Fed.Reg. 68,781 (emphasis added). The Ninth Circuit has adopted this interpretation of the relevant regulations, noting that the Phase II provisions merely "preserve[ ][the] authority for EPA and authorized States to designate *currently unregulated* stormwater discharges." *See Environmental Defense Center*, 344 F.3d at 840. Categorization, treatment, and permitting obligations of *already regulated* sources—like most "point sources" under section 502(14)—remain importantly unaltered; i.e., the Phase II regulations leave wholly unmodified the terms of the CWA—and the NPDES—with regard to regulated sources. *See generally* 33 U.S.C. § 1342(a) & (k); *id.* at § 1311; H.R. Conf. Rep. No. 1004 at 157 ("The permit requirements of the [CWA] respecting [regulated] stormwater discharges are not affected by this amendment.");

*American Mining Congress v. E.P.A.*, 965 F.2d 759, 767 (9th Cir.1992) (noting that preexisting permit requirements—specifically for "point sources"—remain unchanged). Thus, for section 402(p) to apply to PALCO's discharge sources, these sources must have been "unregulated"— both as a matter of time and as a matter of law—at the time of the passage of the 1987 amendments.

They were not necessarily so "unregulated." When understood properly, the "sources" identified in EPIC's complaint were (and are) of an already *regulated* kind. As this court explained in its October 14, 2003, opinion, "point sources" are, in general, an expressly regulated category of pollution dischargers under the CWA, typically governed by the provisions of the NPDES. *See* 33 U.S.C. §§ 1311, 1342. Whether related to silvicultural activity or not, "point sources" generally "fall neatly into a discrete, predetermined category" under the CWA. *See id.; see also* 64 Fed.Reg. 68,781. They are, as such, subject to the permitting provisions of the CWA; they are not, in short, the kind of previously "unregulated" category at issue in the Phase II regulations.[8] *See Environmental Defense Center*, 344 F.3d at 840.

In its complaint, EPIC alleges that many of the pollution sources in the Bear Creek area are "point sources," discharging both stormwater and pollutants into

---

court will not find that Congress would sanction such an environmentally and statutorily strange result.

**8.** To the extent that the alleged "point sources" on or near Bear Creek were previously "unregulated," they were only so because of PALCO's—and EPA's—misinterpretation of section 122.27. The court cured this misinterpretation in its October 14, 2003, opinion. Still, PALCO attempts to revive the thrust of its previous misinterpretation here, treating the silvicultural sources as "unregu-

lated" for the purposes of section 402(p). But the fact that PALCO thinks particular sources "unregulated" does not make it so. As the court's October 14, 2003, makes plain, if a particular source is the type of "point source" EPIC alleges, it must be treated (i.e., regulated) as such. Congress has enacted no rule exempting silvicultural-related "point sources" from the terms of the NPDES, and PALCO's subtle but stubborn attempt to treat such sources as "unregulated" is no surrogate for such legislative action.

the creek itself. *See* First Am. Compl., ¶¶ 37–62. In so doing, EPIC identifies pollution sources that were not—either before 1987 or after—necessarily "unregulated." Rather, they were (and are) "point sources" like other "point sources," subject to the terms of the CWA and the NPDES. *See, e.g.,* 33 U.S.C. §§ 1311, 1342. That PALCO misunderstood—and apparently continues, despite the court's October 14, 2003, opinion, to misunderstand—this point does not change the validity of this legal conclusion or the scope and effect of section 402(p). Where PALCO's Bear Creek runoff system utilizes the kind of conduits and channels embraced by section 502(14), this court has noted, the pollution sources are definitively "point sources"; EPA may not alter this categorization, and section 122.27 does not—and cannot—absolve silvicultural businesses of CWA's "point source" requirements. Nor does section 402(p).[9]

■ The Ninth Circuit recently explained that "[p]rimary responsibility for enforcement of the requirements of the [CWA] is vested in the Administrator of the EPA." *See Environmental Defense Center.,* 344 F.3d at 840. Under the express terms of the statute, this administrative "responsibility" involves, *inter alia,* promulgating such "regulations as are necessary to carry out [the] functions" of the CWA, *see* 33 U.S.C. § 1361(a); these "functions" include, notably, controlling discharges of pollutants into the navigable waters of the United States. *Id.* With this goal in mind, the CWA "renders illegal *any* discharge of pollutants not specifically authorized by a permit." *Environmental Defense Center,* 344 F.3d at 840 (emphasis added); 33 U.S.C. § 1311(a). Perhaps the Eleventh Circuit put it best: "[T]he

amended CWA *absolutely* prohibits the discharge of *any pollutant* by any person, *unless* the discharge is made *according to the terms of an NPDES permit.*" *See Driscoll v. Adams,* 181 F.3d 1285, 1289 (11th Cir.1999) (alterations omitted; third emphasis in original); *see also E.P.A. v. California ex rel. State Water Res. Control Bd.,* 426 U.S. 200, 205, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976); *NRDC v. Costle,* 568 F.2d 1369, 1375–76 (D.C.Cir.1977). Neither section 402(p) nor the rest of the 1987 amendments to the CWA alter this driving CWA principle or this core statutory mission. EPIC's complaint alleges that PALCO has discharged—and continues to discharge—pollutants into Bear Creek without an accompanying NPDES permit. Just as the language of *Driscoll* and *Environmental Defense Center* indicate, EPIC's complaint thus states a claim for which relief may be granted.

### CONCLUSION

PALCO's motion to dismiss EPIC's remaining claims under Federal Rule of Civil Procedure 12(b)(6) is DENIED.

IT IS SO ORDERED.

---

9. In their papers, the parties devote a substantial amount of attention to the meaning of "industrial" under section 402(p) and to the effect of the Phase II regulations overall. Be-

cause the court finds that section 402(p) does not apply in the first instance, the court need not explore those issues here.