CONSERVATION LAW FOUNDATION, Plaintiff,

v.

HANNAFORD BROS. CO., Martin's Foods of South Burlington, Inc., Skipco, Inc., Tire Warehouse Central, Inc., Limoge Brothers, Inc. (Aka Limoge Bros.), Robert J. and Richard Limoge, Ernest C. Hoechner, Jr., the Merchants Bank, and Lucia Investments, Inc., Defendants.

No. 2:03–CV–121.

United States District Court, D. Vermont.

May 14, 2004.

Christopher M. Kiliam, Montpelier, VT, for plaintiff.

R. Bradford Fawley, Brattleboro, VT, for defendant.

## OPINION AND ORDER

SESSIONS, Chief Judge.

Plaintiff Conservation Law Foundation ("CLF"), an environmental organization, brings a citizen-suit action under § 505(a) of the Clean Water Act ("CWA" or "Act"), 33 U.S.C.A. § 1365(a) (West 2001), against Defendants Hannaford Bros. Co., et al. ("Hannaford"). CLF alleges that Hannaford is violating § 301(a) of the CWA, 33 U.S.C.A. § 1311(a) (West 2001), by dis-charging pollutants through a storm drain system without a National Pollution Discharge Elimination System ("NPDES") permit. 33 U.S.C.A. § 1342 (West 2001 & Supp.2003).

Hannaford avers that existing regulations do not require a permit for the Burlington Plaza storm drain and pipe and therefore moves to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6). The other named defendants have joined this motion. For the reasons set forth below, the Court GRANTS Hannaford's motion. and dismisses the complaint against all defendants.

## I. Background

### A. Underlying Facts

The following facts, taken from CLF's complaint are assumed to be true for the purposes of this motion. At the center of this dispute is Burlington Plaza, a commercial property located on Shelburne Road in South Burlington, Chittenden County, Vermont. The Plaza contains a parking lot approximately nine acres in size. Runoff from precipitation falling on Burlington Plaza and surrounding properties flows to a storm drain in the center of the parking lot via drainage contouring. From there, the runoff drains through a subsurface pipe into a swale located along Queen City Park Road. The swale empties into Potash Brook which, in turn, flows into Shelburne Bay of Lake Champlain. Lake Champlain is a "navigable water" under the CWA. The Burlington Plaza storm drain and pipe ("Burlington Plaza") is a "point source" under the CWA. The runoff from Burlington Plaza discharges materials into the swale and Potash Brook, including oil, grease, metals, chloride, phosphorus, bacteria, suspended solids, turbidity, and nitrate nitrogen. These materials are "pollutants" under the CWA.

Defendant Hannaford is incorporated in the State of Maine and registered to con-

duct business in Vermont. Hannaford wholly owns Defendant Martin's Foods of South Burlington. Hannaford and Martin's Foods own, operate and control Burlington Plaza and its storm drain system. The remaining named Defendants own, lease or operate businesses adjacent to Burlington Plaza.

Plaintiff CLF is a private, not-for-profit organization, incorporated in Massachusetts and authorized to carry on activities in Vermont. CLF's purpose is to solve environmental problems that "threaten the people, communities, and natural resources in New England." Pl.'s Compl. at 3 (Doc. 1). CLF claims approximately 600 members in Vermont, including approximately 30 who live in South Burlington. Several of CLF's members own property abutting Potash Brook downstream of the Burlington Plaza.

According to CLF, the discharge of pollutants from Burlington Plaza harms CLF's recreational and aesthetic interests in the impacted waters. CLF asserts that the CWA requires a NPDES permit for the discharge of pollutants from Burlington Plaza and that by discharging pollutants without such a permit, Defendants are violating the CWA.

### B. *Regulatory Framework*

The CWA, 33 U.S.C.A. §§ 1251–1387 (West 2001 & Supp.2003), is intended to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C.A. § 1251(a). Section 301(a) prohibits "the discharge of any pollutant" unless that discharge complies with other specified provisions of the Act, including § 402. 33 U.S.C.A. § 1311(a).[1]

Section 402 provides for the issuance of NPDES permits that allow the holder to discharge pollutants notwithstanding the general prohibition imposed by § 301(a). 33 U.S.C.A. § 1342(a). NPDES permits may be issued by EPA or by state agencies that have been duly authorized by EPA. 33. U.S.C.A. § 1342(a)-(b). In Vermont, the NPDES program is administered by the Vermont Agency of Natural Resources ("VANR").

In 1987, Congress amended the CWA by enacting the Water Quality Act. Pub.L. No. 100–4, 101 Stat. 7 (codified in scattered sections of 33 U.S.C.A. §§ 1251–1387). The Water Quality Act added § 402(p), "Municipal and Industrial Stormwater Discharges," Pub.L. No. 100–4 § 405, 101 Stat. 7 (codified at 33 U.S.C.A. § 1342(p)), to the CWA. Section 402(p) mandates a two-phase regulatory approach to the discharge of pollutants in stormwater. Section 402(p)(1) prohibits EPA or state agencies from requiring NPDES permits for "discharges composed entirely of stormwater" until October 1, 1994. 33 U.S.C.A. § 1342(p)(1).[2] Section 402(p)(2)

---

**1.** The term "discharge of pollutant" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C.A. § 1362(12). In relevant part, 33 U.S.C.A. § 1362 also states:

> Except as otherwise specifically provided, when used in this chapter:

> .    .    .    .    .

> (6) The term "pollutant means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt

and industrial, municipal, and agricultural water...."

> (7) The term "navigable waters" means the waters of the United States, including the territorial seas.

> .    .    .    .    .

> (14) The term "point source" means any discernible, confined and discrete conveyance.

33 U.S.C.A. § 1362.

**2.** The date was originally set for October 1, 1992 but was later extended. Pub.L. No. 102–580, 106 Stat. 4797 (codified at 33 U.S.C.A. § 1342(p)(1)).

exempts four categories of stormwater discharges from this permit moratorium:

(A) A discharge with respect to which a permit has been issued under this section before February 4, 1987.

(B) A discharge associated with industrial activity.

(C) A discharge from a municipal separate storm sewer serving a population of 250,000 or more.

(D) A discharge from a municipal separate storm sewer system serving a population of 100,000 or more but less than 250,000.

33 U.S.C.A. § 1342(p)(2).

Section 402(p)(2) also provides EPA or authorized state agencies with residual authority to designate that a stormwater discharge requires a permit if the discharge "contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States." 33 U.S.C.A. § 402(p)(2)(E).

For the categories of stormwater discharges set forth in § 402(p)(2) ("Phase I discharges"), § 402(p)(3) mandates NPDES permits and § 402(p)(4) establishes a timetable by which EPA is to promulgate regulations setting forth permit application requirements. 33 U.S.C.A. § 1342(p)(3)-(4). In 1990, EPA promulgated a Phase I rule pursuant to § 402(p)(4). *National Pollutant Discharge Elimination System Permit Application Regulation for Stormwater Discharges*, 55 Fed. Reg. 47,990 (Nov. 16, 1990) (codified at 40 C.F.R. pts. 122–24). The Phase I rule requires NPDES permits for those categories of discharges listed in § 402(p)(2).

Congress directed EPA to conduct a study of those stormwater discharges not identified in § 402(p)(2) ("Phase II discharges"). 33 U.S.C.A. § 1342(p)(5). Section 402(p)(5) sets forth the purposes of this study:

(A) identif[y] those stormwater discharges or classes of stormwater discharges for which permits are not required pursuant to paragraphs (1) and (2) of this subsection;

(B) determin[e], to the maximum extent practicable, the nature and extent of the pollutants in such discharges; and

(C) establish[ ] procedures and methods to control stormwater discharges to the extent necessary to mitigate impacts on water quality.

33 U.S.C.A. § 1342(p)(5)

Section 402(p)(6) requires EPA to issue regulations based on the results of the study. 33 U.S.C.A. § 1342(p)(6). The regulations shall "designate stormwater discharges other than [the Phase I discharges identified in § 402(p)(2)] to be regulated to protect water quality" and "establish a comprehensive program to regulate such designated sources." *Id.* At minimum, the program must: "(A) establish priorities, (B) establish requirements for State stormwater management programs, and (C) establish expeditious deadlines." *Id.* The program "may include performance standards, guidelines, guidance, and management practices and treatment requirements, as appropriate." *Id.* According to § 402(p)(6), EPA was to promulgate the program by October 1, 1993, one year prior to the expiration of the permit moratorium. *Id.*

On December 8, 1999, more than six years after the required date and more than five years after the expiration of the permit moratorium, EPA promulgated the Phase II rule. *Regulations for Revision of the Water Pollution Control Program Addressing Storm Water Discharges*, 64 Fed.Reg. 68,722 (Dec. 8, 1999) (codified at 40 C.F.R. pts. 9, 122, 123 and 124). Under the Phase II rule, NPDES permits are required for stormwater discharges from small municipal sewer systems and from small construction sites. 40 C.F.R. § 122.26(a)(9)(i). The Phase II rule also

preserves the residual authority of EPA and authorized state agencies to designate that a stormwater discharge requires a permit. *Id.*[3] EPA's retention of its residual designation authority has been upheld as a legitimate exercise of its statutory authority pursuant to § 402(p)(2)(E) and (p)(6). *Envtl. Def. Ctr., v. EPA,* 344 F.3d 832, 874–76 (9th Cir.2003).

## II. *Preliminary Matters*

### A. *Jurisdiction*

Although neither party disputes this Court's jurisdiction, a federal court has an independent duty to examine its own jurisdiction. *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990). Section 505(a) provides the district courts with jurisdiction to hear a citizen suit alleging a violation of an "effluent standard or limitation." 33 U.S.C.A. § 1365(a)(1). The term "effluent standard or limitation" is defined in part as "an unlawful act under [§ 301(a) ] of this title." 33 U.S.C.A. § 1365(f). Because CLF alleges that Hannaford's discharge of stormwater is unlawful under § 301(a), this Court has jurisdiction.

### B. *Ripeness*

On June 27, 2003, CLF filed a petition with VANR seeking a determination that various stormwater discharges, including the discharge at issue here, required NPDES permits. Def.'s Supp. Brief at 2 (Doc. 22). In its initial motion to dismiss, Hannaford asserted that the instant case was not ripe for adjudication. Def.'s Mem. in Support at 21 (Doc. 3). On September 26, 2003, VANR denied CLF's petition. Def.'s Supp. Brief at 2–3. Upon VANR's denial of CLF's petition, Hannaford withdrew its motion to dismiss for lack of ripeness. *Id.* at 6. CLF has subsequently appealed VANR's decision to the Vermont Water Resources Board ("VWRB").

Although certainly related, CLF's ongoing administrative action does not address the issue presented in this case. Nowhere in the pleadings does CLF contend that the Burlington Plaza falls within the categories of stormwater discharges required to obtain a permit under the Phase I and Phase II rules. Nor does CLF claim that EPA or VANR has exercised its residual designation authority to require a permit for the Burlington Plaza.

Instead, CLF interprets § 301(a) to prohibit all stormwater discharges notwithstanding any categorical or individual designation issued (or not issued) by EPA or VANR. According to CLF's interpretation of the CWA, Burlington Plaza violates, and will continue to violate, § 301(a) regardless of the ultimate outcome of the administrative appeal. As a result, there is no reason for the Court to defer judgment until VWRB has issued a decision.

CLF strenuously objects to any consideration of the administrative action on the ground that it exceeds the scope of the pleadings. The Court does not rely on

---

**3.** EPA or an authorized state agency may exercise its residual designation authority to require a permit if:

    (C) The Director, or in States with approved NPDES programs either the Director or the EPA Regional Administrator, determines that storm water controls are needed for the discharge based on wasteload allocations that are part of "total maximum daily loads" (TMDLs) that address the pollutant(s) of concern; or

    (D) The Director, or in States with approved NPDES programs either the Director or the EPA Regional Administrator, determines that the discharge, or category of discharges within a geographic area, contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States. 40 C.F.R. § 122.26(a)(9)(i).

anything related to the administrative action in reaching its decision.

### III. *Legal Standard*

On a motion to dismiss pursuant to Rule 12(b)(6), "a court has to consider the legal sufficiency of the claim as stated in the complaint and is not to weigh facts underlying the claim or the merits of the case." *Esden v. Bank of Boston,* 5 F.Supp.2d 214, 216 (D.Vt.1998) (citing *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985)). Dismissal is impermissible unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). "In ruling on such a motion, the court must look only to the allegations in the complaint and any documents attached to or incorporated by reference in the complaint." *Dangler v. New York City Off Track Betting Corp.,* 193 F.3d 130, 138 (2d Cir.1999). Morever, the court must assume all well-pleaded factual allegations to be true and draw reasonable inferences in the light most favorable to the plaintiff. *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996).

### IV. *Discussion*

As discussed, CLF does not contend that the Burlington Plaza falls into the categories of stormwater discharges required to obtain a permit under the Phase I and Phase II rules. Therefore, the question before the Court is whether § 301(a) of the CWA prohibits the Burlington Plaza from discharging stormwater without an NPDES permit even though neither EPA nor VANR require the Burlington Plaza to obtain a NPDES permit.

#### A. *Statutory Text*

The Court's "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). Section 301 states "[e]xcept as in compliance with this section and [other specified sections, including § 402], the discharge of any pollutant by any person shall be unlawful." 33 U.S.C.A. § 1311(a). Therefore, the discharge of a pollutant in compliance with § 402 does not violate § 301(a).

Section 402 cannot be interpreted to require NPDES permits for all stormwater discharges notwithstanding regulations or individual determinations issued (or not issued) by EPA or authorized state agencies. There are two principal reasons why the plain language of the text prevents such an interpretation. First, § 402(p)(5)-(6) directs EPA to study the Phase II stormwater discharges and grants EPA discretion to develop a program that distinguishes between those stormwater discharges that require regulation and those that do not. Section 402(p)(5)-(6) would be utterly meaningless if all stormwater discharges were to require NPDES permits regardless of EPA's regulations. It is a cardinal principle of statutory construction that courts give effect, if possible, to every clause and word of the statute. *E.g., Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) (collecting cases).

Congress uses clear language in § 402(p)(5)-(6) to grant EPA discretion to determine that certain stormwater discharges require regulation while others do not. Section 402(p)(5) states that the purpose of EPA's study is to "establish[ ] procedures and methods to control stormwater discharges to the extent necessary to mitigate impacts on water quality." 33 U.S.C.A. § 1342(p)(5). EPA is not mandated to control all stormwater discharges, only those "necessary to mitigate impacts on water quality." *Id.*

In § 402(p)(6), Congress directs EPA to "designate stormwater discharges [other than the Phase I discharges identified in § 402(p)(2) ] to be regulated to protect water quality." 33 U.S.C.A. § 1342(p)(2)(6). EPA "shall establish a comprehensive program to regulate such designated sources." *Id.* Merriam–Webster's Collegiate Dictionary defines the verb "designate" as "[t]o indicate and set apart for a specific purpose." Merriam–Webster's Collegiate Dictionary 312 (10th ed.2002). The authority to designate or set apart some stormwater discharges for regulation carries with it the authority to leave other stormwater discharges unregulated. Congress' order that EPA "designate" certain stormwater discharges for regulation would be superfluous if all stormwater discharges were to be regulated notwithstanding EPA's designation.

■ Second, although EPA ultimately promulgated Phase II rules that use NPDES permits as the control mechanism for stormwater discharges, nothing in § 402(p)(6) requires EPA to use NPDES permits in its regulatory program. Section 402(p)(6) only requires that the program: "(A) establish priorities, (B) establish requirements for State stormwater management programs, and (C) establish expeditious deadlines." 33 U.S.C.A. § 1342(p)(6). In sharp contrast, § 402(p)(3) specifically requires NPDES permits for Phase I discharges and § 402(p)(4) directs EPA to promulgate permit application requirements for those discharges. 33 U.S.C.A. § 1342(p)(3)-(4). Had Congress intended to mandate NPDES permits for all Phase II discharges, it knew how to say so and would have done so. *Cf. Touche Ross & Co. v. Redington,* 442 U.S. 560, 572, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) ("[W]hen Congress wished to provide a private damage remedy, it knew how to do so and did so expressly."); *see also Envtl. Def. Ctr.,* 344 F.3d at 844 ("EPA was free to adopt [in the Phase II rules] any regulatory program, including a permitting program, that included [the elements set forth in § 402(p)(6) ]. It is more reasonable to interpret congressional silence about permits as an indication of EPA's flexibility not to use them than as an outright prohibition.") (citations omitted). In sum, § 402(p)(5)-(6) does not require EPA to regulate all stormwater discharges, nor does it require EPA to use NPDES permits to regulate those discharges EPA does designate for regulation.

CLF acknowledges that, as a non-Phase I discharger, the Burlington Plaza enjoyed a seven-year permit moratorium. 33 U.S.C.A. § 1342(p)(1)-(2). Nevertheless, CLF contends that § 301(a)'s prohibition on all permit-less stormwater discharges once again became the law of the land when the permit moratorium expired on October 1, 1994. CLF argues the Burlington Plaza has been continuously violating § 301(a) since that date.

CLF may be correct that upon the expiration of the permit moratorium all stormwater discharges without permits were in violation of § 301(a). This is because EPA did not issue the Phase II rules until December 8, 1999 and they did not become effective until February 7, 2000. *Regulations for Revision of the Water Pollution Control Program Addressing Storm Water Discharges,* 64 Fed.Reg. 68,722 (Dec. 8, 1999) (codified at 40 C.F.R. pts. 9, 122, 123 and 124). Thus, it could be argued that during the more than five-year period between the end of the moratorium and the effective date of the Phase II rules, all stormwater discharges without a permit, including the Burlington Plaza, were subject to the permit requirement and were violating § 301(a).

■ The Court not need not address this question, however. As discussed, the plain language of § 402(p) authorizes EPA

to issue regulations designating which stormwater discharges are to be regulated and which are to be left unregulated. When those Phase II regulations went into effect, a stormwater discharge left unregulated fell into compliance with § 402(p) unless EPA or an authorized state agency later exercised its residual designation authority to require an NPDES permit for that discharge. A stormwater discharge that complies with § 402(p) does not violate § 301(a). Because CLF does not contend that the Burlington Plaza violates an existing regulation or an individual designation by EPA or VANR, CLF fails to state a legally cognizable claim that Hannaford currently violates § 301(a). CLF is precluded from bringing a claim based on past violations because § 505(a) does not authorize citizen suits for past violations of the CWA. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 56–64, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987).

### B. *Legislative History*

CLF argues that the legislative history of the Water Quality Act supports CLF's interpretation that upon the expiration of the permit moratorium, all stormwater discharges previously subject to the § 301(a) prohibition once again became prohibited, regardless of any regulations or individual designations issued (or not issued) by EPA or authorized state agencies pursuant to § 402(p)(5)-(6). Where, as in this case, "the words of the statute are unambiguous, the 'judicial inquiry is complete.'" *Desert Palace v. Costa*, 539 U.S. 90, 98, 123 S.Ct. 2148, 2153, 156 L.Ed.2d 84 (2003)(quoting *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981)).

To the extent that there is any ambiguity in the statutory text, however, the legislative history does not support CLF's argument. For example, CLF quotes Congressman Roe, Chairman of the House Subcommittee on Water Resources during the development of the Water Quality Act:

> The control of storm water discharges to protect the quality of the Nation's waters is a vast undertaking which, under existing law, would require an estimated 1 million permits. The provision in the bill establishes an orderly procedure which will enable the major contributors of pollutants to be addressed first, and all discharges to be ultimately addressed in a manner which will not completely overwhelm EPA's capabilities.

133 Cong. Rec. H168–03 (daily ed. Jan. 8, 1987).

CLF reads Congressman Roe's statement to mean that all stormwater discharges ultimately will require NPDES permits. In fact, Congressman Roe only states that all stormwater discharges will be "addressed" in a manner that will not overwhelm EPA. By issuing the Phase II rules and retaining its residual designation authority, EPA did address all remaining stormwater discharges in a manner that has not overwhelmed its capabilities.

Moreover, the legislative history is replete with evidence that Congress was concerned with the overwhelming and unnecessary regulation created by the absolute prohibition on all stormwater discharges that existed before the enactment of the Water Quality Act. To cite just one example:

> The new language [in the Water Quality Act] will properly reduce the universe of permits required for storm water from millions to thousands without reducing the protection of the environment. We established a mechanism that will require permits only where necessary-rather than in every instance. Without these changes, local, State, and Federal officials would be inundated with an enormous permitting workload even

though most of the discharges would not have significant environmental impacts. 133 Cong. Rec. H168, H170 (daily ed. Jan. 8, 1987) (statement of Rep. Hammerschmidt).

Congress' concern about over-regulation was also evident during the 1992 debate concerning the extension of the permit moratorium:

> EPA has missed its target deadlines and is only now beginning to implement stormwater regulations for industries and large cities. EPA and the States are simply not ready to move ahead on storm water regulations for smaller cities-that is, cities under 100,000 population-and for countless other discharges.... When th[e] moratorium expires, small towns, non-industrial concerns such as parking lot owners, and even private homeowners, could be in violation of the act unless Congress moves to extend the deadline. And that is precisely what my bill does-nothing more, nothing less.

138 Cong. Rec. H9789–02 (daily ed. Sept. 29, 1992) (statement of Rep. Hammerschmidt).

Representative Hammerschmidt's statement that upon expiration of the moratorium various stormwater discharges could violate the CWA was correct because at the time the statement was made EPA had yet to promulgate the Phase II rules. In order to avoid burdensome over-regulation, an extension on the permit moratorium was necessary to give EPA time to develop and promulgate the Phase II rules. Representative Hammerschmidt's statement does not bolster CLF's contention that upon expiration of the moratorium all permit-less stormwater discharges would violate the CWA regardless of EPA's rules.

Taken as a whole, the legislative history of the Water Quality Act supports this Court's interpretation of the unambiguous language of § 402(p)(5)-(6).

### C. EPA Guidance

CLF also cites to a number of EPA guidance documents that, according to CLF, demonstrate EPA's position that all permit-less stormwater discharges are prohibited under § 301(a). This argument is refuted by the United States' Amicus Curiae Brief (Doc. 28), which essentially interprets the CWA in the same manner set forth above.

CLF does not directly challenge EPA's Phase II rules.[4] Nevertheless, CLF argues that EPA "could not create exemptions to section 301(a) for stormwater discharges by rule." Pl.'s Opp. Mem. at 3 (Doc. 15). In support of this proposition, CLF relies on the analysis set forth in *NRDC v. Costle*, 568 F.2d 1369 (D.C.Cir. 1977). In *Costle*, the D.C. Circuit reviewed EPA regulations that exempted several categories of point source discharges from NPDES permit requirements. After reviewing the legislative history of the CWA, the D.C. Circuit held that "Congress intended the NPDES permit to be the only means by which a discharger from a point source may escape the total prohibition of § 301(a)." *Id.* at 1374. The court ruled that EPA did not "have authority to exempt categories of point sources from the permit requirements of § 402." *Id.* at 1377.

CLF's reliance on *Costle* is misplaced. *Costle* was decided ten years prior to the enactment of the Water Quality Act and

---

**4.** A challenge to EPA's stormwater regulations would be subject to the jurisdiction of the federal courts of appeals. 33 U.S.C.A. 1369(b)(1); *Envtl. Def. Ctr.*, 344 F.3d at 843.

Moreover, EPA's Phase II rules, including its residual designation authority, have been largely upheld by the Ninth Circuit. *Envtl. Def. Ctr.*, 344 F.3d at 843–79.

the addition of § 402(p). As a result, the holding in *Costle* has no bearing either upon this Court's interpretation of the plain language of § 402(p) or upon EPA's authority to promulgate regulations pursuant to § 402(p).

CLF's reliance on *Environmental Protection Information Center (EPIC) v. Pacific Lumber Co. (PALCO)*, No. C. 01–2821 MHP, (N.D.Cal. Oct. 14, 2003), is equally unavailing. Pl.'s Supp. Mem. (Doc. 25). In *EPIC*, the district court held that EPA's silviculture regulations could not be interpreted to define point source discharges from silvicultural activities as non-point sources. *Id.* at 19–21. The court did not examine EPA's regulations on stormwater discharges, which are at issue in this case.[5]

CLF nonetheless contends that this Court should follow the Northern District of California's lead and interpret EPA's "residual designation authority regulation in a manner that is harmonized with the Clean Water Act." Pl.'s Supp. Mem. at 2. CLF cites *EPIC* for the proposition that the Phase II rules do not "exempt" the Burlington Plaza from regulation because EPA and VANR retain residual designation authority to require a permit from the system.

It is undisputed that EPA or VANR could exercise their residual designation authority to require a permit from the Burlington Plaza. 40 C.F.R.

§ 122.26(a)(9)(i). It is equally undisputed that neither agency has done so. Therefore, although CLF is correct that the Burlington Plaza is not forever "exempt" from the possibility of future regulation, this fact does not advance CLF's claim that the system currently violates the CWA.

CLF further asserts that EPA's and VANR's residual designation authority to require a permit for the Burlington Plaza cannot be interpreted to preclude this Court from exercising the same authority. According to CLF, such an interpretation would deprive this Court of its subject matter jurisdiction to hear a citizen suit.

CLF's argument does not raise a valid jurisdictional question. District courts undoubtedly have jurisdiction to hear a citizen suit alleging an ongoing violation of § 301(a). 33 U.S.C.A. § 1365(a), (f). Instead, CLF argues that district courts have the authority, independent of EPA and VANR, to designate stormwater discharges as requiring NPDES permits.

Nowhere does the CWA provide the district courts with this authority. Rather, residual designation authority is explicitly vested in EPA and authorized state agencies. 33 U.S.C.A. § 1342(p)(2)(E), (p)(6). District courts lack the institutional capability to determine whether a stormwater discharge "contributes to a violation of a water quali-

---

**5.** The district court later issued a second opinion denying PALCO's motion to dismiss EPIC's remaining claims. *Envtl. Prot. Info. Ctr. (EPIC) v. Pac. Lumber Co. (PALCO)*, 301 F.Supp.2d 1102, 1113 (N.D.Cal.2004). PALCO argued that the stormwater discharges in question were not required to obtain a NPDES permit because the discharges were exempt under § 402(p). *Id.* at 1109–10. The court held that two threshold questions govern the applicability of § 402(p): (1) whether the discharges are composed entirely of stormwater, and (2) whether the discharges

are unregulated. *Id.* at 1111. The court concluded that § 402(p) was inapplicable because EPIC alleged that the discharges contained pollutants and therefore they could not be considered to be composed entirely of stormwater. *Id.* Furthermore, the stormwater discharges were from point sources and as a result were not currently unregulated by the CWA. *Id.* at 1112.

To the extent that the holding set forth here is at odds with the Northern District of California's opinion, this Court respectfully declines to follow that opinion.

ty standard or is a significant contributor of pollutants to waters of the United States." 33 U.S.C.A. § 402(p)(2)(E). If this Court were to make such a determination, it would improperly assume control over the administration of NPDES permitting by EPA and VANR. *See Morris v. City of Santa Cruz,* No. C 93–20496, 1994 WL 514032 at *2 (N.D.Cal. Sept.6, 1994) (CWA does not give district courts the authority to exercise residual designation authority pursuant to § 402(p)(2)(E)).

## V.  *Conclusion*

For the reasons stated above, Hannaford's Motion to Dismiss (Doc. 2) is GRANTED.  The complaint against all defendants is dismissed.