**ENVIRONMENTAL PROTECTION INFORMATION CENTER, a non-profit corporation, Plaintiff,**

v.

**PACIFIC LUMBER COMPANY, a Delaware corporation; Scotia Pacific Company LLC, a Delaware corporation; Environmental Protection Agency; and Christine Todd Whitman, Defendants.**

**No. C 01–2821 MHP.**

United States District Court, N.D. California.

April 28, 2006.

Michael R. Lozeau, Law Office of Michael R. Lozeau, Alameda, CA, Deborah A. Sivas, Stanford Law School, Environmental Law Clinic, Stanford, CA, Sharon Eileen Duggan, Law Offices of Sharon E. Duggan, Oakland, CA, for Plaintiff.

Bruce Stewart Flushman, Stoel Rives LLP, Christopher J. Carr, Edgar B. Washburn, Shaye Diveley, Morrison & Foerster LLP, Mark A. Rigau, U.S. Dept of Justice, Environmental & Natural Resources Division, San Francisco, CA, Frank Shaw Bacik, John A. Behnke, Carter Behnke Oglesby & Bacik, Ukiah, CA, J. Michael Klise, Crowell & Moring LLP, Washington, DC, for Defendants.

### MEMORANDUM & ORDER

PATEL, District Judge.

### Parties' Cross–Motions for Summary Judgment

On July 24, 2001 plaintiff Environmental Protection Information Center ("EPIC"), a non-profit environmental organization, brought a citizen-suit action under section 505(a) of the Clean Water Act ("CWA"), 33 U.S.C. section 1365(a), against Pacific Lumber Company and Scotia Pacific Lumber Company (collectively "PALCO"), the Environmental Protection Agency ("EPA"), and Christine Todd Whitman as EPA Administrator.[1]

Now before the court are PALCO's motion for summary judgment regarding

---

1. Pursuant to Federal Rule of Civil Procedure 25(d)(1), Michael Leavitt, new Administrator of EPA, automatically replaces his predecessor in this suit. *See* Fed.R.Civ.P. 25(d)(1).

EPIC's first and second claims for relief[2] and EPIC's cross-motion for summary judgment on the issue of PALCO's liability. The court has considered the parties' arguments fully, and for the reasons set forth below, the court rules as follows.

BACKGROUND

I. *Background Facts*

In each of its prior decisions the court has set forth the underlying facts of this action in significant detail, and it is not necessary to restate that background here in order to resolve the motions currently before the court. The court, rather, need only reframe the core dispute.

At the heart of this litigation is Bear Creek, a brook situated several miles upstream of Scotia, California. A tributary of the Eel River, Bear Creek creates a watershed that covers 5500 acres of land throughout Humboldt County, California. Pacific Lumber Company and its wholly-owned subsidiary, defendant Scotia Pacific Lumber Company, own some ninety-five percent of the land in the Bear Creek watershed, much of which PALCO uses for logging.[3]

According to EPIC, substantial logging activity (primarily PALCO's) in the watershed area has spurred a dramatic increase in the amount of sediment deposited in Bear Creek. Before significant logging began, EPIC claims, Bear Creek's sediment deposit peaked at approximately 8,000 tons per year; after logging practices commenced, sediment deposit climbed to 27,000 tons per year. This sediment increase, EPIC alleges, has a specific source: PALCO's timber harvest-ing and construction of unpaved roads. According to EPIC, PALCO's logging activity increases sediment through the following process. First, EPIC notes, timber harvesting removes vegetation from the ground surface, making soil more susceptible to erosion and landslides. Construction of unpaved roads then exposes more soil, which, in turn, further destabilizes slopes. The effect of timber harvesting and road construction, EPIC contends, is to expose far more destabilized soil than is environmentally sustainable. When it rains, EPIC explains, the rain water carries the exposed silts and sediments—as well as other pollutants, such as pesticides and diesel fuel—into culverts, ditches, erosion gullies, and other alleged channels. From these various channels, silts, sediments and pollutants flow directly into Bear Creek. The consequences of PALCO's drainage system, EPIC notes, are predictable and environmentally adverse; PALCO's present and future timber harvest plans, EPIC adds, promise only to make the situation worse.

EPIC believes PALCO's present drainage system violates various provisions of the Clean Water Act, including (but not necessarily limited to) the National Pollutant Discharge Elimination System ("NPDES"). *See* 33 U.S.C. §§ 1251(a), 1311(a), 1342(a); *see also Environmental Def. Ctr., Inc. v. United States Envtl. Prot. Agency ("EPA")*, 344 F.3d 832 (9th Cir. 2003), *cert. denied*, 541 U.S. 1085, 124 S.Ct. 2811, 159 L.Ed.2d 246 (2004); *Association to Protect Hammersley v. Taylor Res., Inc.*, 299 F.3d 1007, 1016 (9th Cir.2002)

2. Pursuant to the parties' stipulation, PALCO's motion for summary judgment as to EPIC's claims alleging violations of the California Unfair Competition Law is stayed pending a final decision by the California Supreme Court on its review of cases concerning the question of whether the terms of Proposition 64 apply to cases pending at the time Proposition 64 became law.

3. Both Pacific Lumber and Scotia Pacific Lumber Company are Delaware corporations; both maintain principal places of business in Scotia, California.

(noting that, in 1972, "Congress passed the Clean Water Act amendments, 33 U.S.C. §§ 1251–1387, to respond to environmental degradation of the nation's waters."); *Natural Resources Defense Council ("NRDC") v. EPA*, 822 F.2d 104, 109 (D.C.Cir.1987) (citing 33 U.S.C. § 1311(a)). In substantial part, EPIC alleges that PALCO has used a variety of "point sources," *see* 33 U.S.C. § 1362(14), to discharge pollutants without first securing necessary NPDES permits. Absent such permits, EPIC claims, PALCO's system conflicts with defendants' CWA obligations.

II. *Statutory and Regulatory Background*

With the goal of "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters," Congress enacted the CWA in 1972. 33 U.S.C. § 1251(a) (originally codified as the Federal Water Pollution Control Act, 62 Stat. 1155); *see Association to Protect Hammersley*, 299 F.3d at 1016; *Pronsolino v. Nastri*, 291 F.3d 1123, 1126 (9th Cir.2002) (observing that prior federal water pollution regulation "had proven ineffective"), *cert. denied*, 539 U.S. 926, 123 S.Ct. 2573, 156 L.Ed.2d 602 (2003). Built on a "fundamental premise" that the unauthorized "discharge of any pollutant by any person shall be unlawful,'" *NRDC v. EPA*, 822 F.2d at 109 (citing 33 U.S.C. § 1311(a)), the CWA "establishes a comprehensive statutory system for controlling water pollution." *Association to Protect Hammersley*, 299 F.3d at 1009 (citation and internal quotation marks omitted). This broad

statutory scheme includes, *inter alia*, a National Pollutant Discharge Elimination System (NPDES) for regulation of pollutant discharges into the waters of the United States. *See* 33 U.S.C. §§ 1311(a), 1342(a). Under the NPDES, permits may be issued by EPA or by States that have been authorized by EPA to act as NPDES permitting authorities. *See* 33 U.S.C. § 1342(a)—(b); *see also Environmental Def. Ctr., Inc.*, 344 F.3d at 841 (holding that pollution dischargers must comply with "technology-based pollution limitations (generally according to the 'best available technology economically achievable,' or 'BAT' standard).");  *NRDC v. EPA*, 822 F.2d at 110 (noting that, when necessary, water quality-based standards may supplement technology standards). California has been so authorized.[4]

Not all pollutants or pollution sources fall within the purview of the NPDES. Under the CWA, "discharge of pollutant" is defined as "any addition of any pollutant to navigable waters from any *point source*." 33 U.S.C. § 1362(12)(A) (emphasis added). The CWA's and NPDES's focus, then, trains largely on pollutant discharges from "point sources," a term the Act defines as:

> any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be

**4.** The EPA delegated its permit-issuing authority to California on May 14, 1973. *See* 39 Fed.Reg. 26,061 (July 16, 1974). California administers its portion of the NPDES program through the Porter–Cologne Water Quality Control Act ("Porter–Cologne Act"), Cal. Water Code § 13000 *et seq.*, which, in turn, created a group of Regional Water Quality Control Boards charged with the responsibility of issuing Waste Discharge Requirements ("WDRs"). By every relevant measure, WDRs are equivalent to CWA permits, and in every relevant sense for this action, the Porter–Cologne Act imports its definitions from the CWA, including those for "pollutants," "discharge," and "point source." *See* Cal. Water Code § 13373.

discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture. *Id.* at § 1362(14); *see also id.* at § 1362(6) (defining "pollutant" broadly to include substances ranging from rock and sand to industrial, municipal, and industrial wastes).

The CWA distinguishes "point sources" from "nonpoint sources." The NPDES recognizes—and functions on the basis of—this distinction, requiring permits only for such "point source" emissions. *See, e.g., League of Wilderness Defenders v. Forsgren,* 309 F.3d 1181, 1183 (9th Cir. 2002) ("Point source pollution is distinguished from 'nonpoint source pollution,' which is regulated in a different way and does not require [the NPDES] type of permit."). Unlike "point sources," "nonpoint sources"[5] are regulated indirectly: the CWA directs EPA to disseminate information regarding nonpoint pollution sources, *see* 33 U.S.C. § 1314(f), but it is often through state management programs that "nonpoint sources" are monitored and controlled. *See Oregon Natural Desert Ass'n v. Dombeck,* 172 F.3d 1092, 1096–97 (9th Cir.1998), *cert. denied,* 528 U.S. 964, 120 S.Ct. 397, 145 L.Ed.2d 310 (1999).[6]

### III. *Procedural History*

In an effort to compel PALCO to comply with the putative terms of the CWA, EPIC brought a citizen-suit action under section 505(a) of the CWA, 33 U.S.C. section 1365(a), against PALCO, the EPA, and then-EPA Administrator Christine Todd Whitman. EPIC's first two claims allege, generally stated, that PALCO's drainage system employs a number of unpermitted "point sources" to discharge pollutants; EPIC later added a third claim, alleging that the adoption of a particular EPA regulation—40 C.F.R. section 122.27—constituted an *ultra vires* act. A number of potentially dispositive motions followed.

On June 6, 2003 the court denied EPA's motion to dismiss and denied PALCO's motion to dismiss in part, concluding that EPIC could pursue a claim under the Administrative Procedures Act ("APA") in this court and that EPIC's claim was not time-barred. On October 14, 2003 the court denied EPIC's motion for summary adjudication on its third claim for relief, granting EPA's and PALCO's cross-motions for summary adjudication and construing 40 C.F.R. section 122.27 to be consistent with the governing provisions of the CWA. On January 23, 2004 the court denied PALCO's motion to dismiss EPIC's remaining claims (that is, its first and second claims for relief) under Federal Rule of Civil Procedure 12(b)(6) and held that PALCO's "point sources"—to the extent they exist—must comply with the terms of the NPDES and the CWA. Further, on April 19, 2004 the court denied PALCO's

---

**5.** As the Ninth Circuit has noted, "nonpoint source pollution is not statutorily defined." *League of Wilderness Defenders,* 309 F.3d at 1184. As the Ninth Circuit has also noted, "nonpoint source pollution ... is widely understood to be the type of pollution that arises from many dispersed activities over large areas ... not traceable to any single discrete source." *Id.* The paradigmatic example of nonpoint source pollution, the Ninth Circuit adds, is automobile residue—whether rubber, metal, oil, or gas—left on the roadways. *Id.*

**6.** The CWA's distinct approach to regulation of "nonpoint sources" should not be seen as an indication that "nonpoint sources" constitute an insignificant source of pollution. In fact, quite the opposite is true. As the Ninth Circuit recently observed, nonpoint source pollution from automobile use itself outstrips point source pollution from chemical spills, factories, and sewage plants; indeed, nonpoint source pollution from automobile use is the largest source of water pollution in the United States. *See League of Wilderness Defenders,* 309 F.3d at 1184 (citation omitted).

motion to certify three of the court's decisions for interlocutory review under 28 U.S.C. section 1292(b).

On July 12, 2005 PALCO filed a Notice of Intent ("NOI") to comply with the terms of the General Permit to Discharge Storm Water Associated With Industrial Activity (WQ Order No. 97–03–DWQ) ("Industrial General Permit" or "IGP") for PALCO's logging operations in the Bear Creek Watershed. Christopher J. Carr Dec., Exh. A at 2; *see also* Joint Statement of Undisputed Facts in Support of PALCO's Motion for Summary Judgment (hereinafter "JSUF") at 3. On the same date, PALCO also filed a Storm Water Pollution Prevention Plan ("SWPPP"), which is a document filed along with the NOI that outlines practices and procedures the applicant will implement to reduce or prevent industrial pollutants in storm water discharges. Carr Dec., Exh. C at 3; *see also* JSUF at 1. PALCO submitted the NOI and SWPPP "solely in response" to the court's previous decisions in this action. Carr Dec., Exh. C at 11. PALCO does not acknowledge the "correctness of those orders" and it "reserves its right to, and will, challenge those orders through appellate review." *Id.* at 11–12. On July 22, 2005 the State Water Resources Control Board ("State Water Board") notified PALCO that it had received and processed PALCO's NOI. Carr Dec., Exh. B at 2. The State Water Board informed PALCO that it must comply with the IGP requirements unless and until it submits a Notice of Termination ("NOT") to the Regional Water Board, which the Regional Water Board must then approve, stating that PALCO's facility no longer needs coverage under the IGP. Carr Dec., Exh. B at 2.

PALCO now urges the court to find that its procurement of the IGP has rendered EPIC's claims moot. In response, EPIC contends that PALCO, in procuring the IGP, has conceded its liability under the CWA.

*LEGAL STANDARD*

I. *Summary Judgment*

Summary judgment is proper when the pleadings, discovery, and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are those which may affect the outcome of the proceedings. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. *Id.; see also Gasaway v. Northwestern Mut. Life Ins. Co.,* 26 F.3d 957, 960 (9th Cir.1994). The court may not make credibility determinations, *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505, and inferences drawn from the facts must be viewed in the light most favorable to the party opposing the motion. *Masson v. New Yorker Magazine,* 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991).

## II. Mootness

The jurisdiction of federal courts depends on the existence of a "case or controversy" under Article III of the Constitution. *Liner v. Jafco, Inc.*, 375 U.S. 301, 306 n. 3, 84 S.Ct. 391, 11 L.Ed.2d 347 (1964). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Demery v. Arpaio*, 378 F.3d 1020, 1025 (9th Cir.2004) (internal quotation marks omitted) (quoting *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)), *cert. denied*, — U.S. ——, 125 S.Ct. 2961, 162 L.Ed.2d 887 (2005). In considering whether an action is moot, the principal question to be asked is whether the court can grant *"any* effective relief." *Blue Ocean Pres. Soc'y v. Watkins*, 767 F.Supp. 1518, 1523 (D.Haw.1991) (internal quotation marks omitted) (quoting *Northwest Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1245 (9th Cir.1988)); *see also Neighbors of Cuddy Mt. v. Alexander*, 303 F.3d 1059, 1065 (9th Cir.2002) (holding that "completion of activity is not the hallmark of mootness. Rather, a case is moot only where no effective relief for the alleged violation can be given." (citing *Cantrell v. City of Long Beach*, 241 F.3d 674, 678 (9th Cir.2001))). A "party moving for dismissal on mootness grounds [thus] bears a heavy burden." *Demery*, 378 F.3d at 1025 (internal quotation marks omitted) (quoting *Coral Constr. Co. v. King County*, 941 F.2d 910, 927–28 (9th Cir.1991), *cert. denied*, 502 U.S. 1033, 112 S.Ct. 875, 116 L.Ed.2d 780 (1992)).

In general, a defendant's voluntary cessation of a challenged practice "does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (internal quotation marks omitted) (quoting *City of Mesquite v. Aladdin's Castle*, 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982)). Indeed, the Supreme Court has recognized that "[i]f it did, the courts would be compelled to leave the defendant ... free to return to his old ways." *Id.* (internal quotation marks omitted) (quoting *City of Mesquite*, 455 U.S. at 289 n. 10, 102 S.Ct. 1070). Accordingly, a defendant's voluntary cessation of an allegedly unlawful activity does not render a case moot unless the defendant meets the "heavy burden of persuading" the court that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *See id.* (internal quotation marks omitted) (quoting *United States v. Concentrated Phosphate Export Ass'n, Inc.*, 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968)). *See also Anderson v. Evans*, 371 F.3d 475, 479 (9th Cir.2004); *San Francisco Baykeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1160 (9th Cir.2002), *cert. dismissed*, 539 U.S. 924, 123 S.Ct. 2296, 156 L.Ed.2d 147 (2003). A party asserting mootness also can meet its burden by establishing that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Norman–Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1274 (9th Cir.1998) (internal quotation marks omitted) (quoting *Lindquist v. Idaho State Bd. of Corr.*, 776 F.2d 851, 854 (9th Cir.1985)). The standard for assessing voluntary cessation is "stringent." *Laidlaw*, 528 U.S. at 189, 120 S.Ct. 693.

## DISCUSSION

### I. PALCO's Motion for Summary Judgment

PALCO contends that its decision to apply for and obtain a permit renders each of EPIC's claims moot. EPIC's first claim for relief is based on PALCO's discharging storm water into Bear Creek without an

NPDES permit. *See* First Amended Complaint (hereinafter "FAC") ¶¶ 55–56. EPIC's second claim for relief, similarly, is based on PALCO's failure to apply for and obtain an NPDES permit for such alleged discharges. *See* FAC ¶¶ 59–60. PALCO contends that this action is moot because the court cannot grant any effective relief to EPIC or its members. In response, EPIC contends that its claims are not moot because PALCO has not met its heavy burden of persuading the court that it is absolutely clear that the challenged activity at Bear Creek will not recur.

## A. Burden to Prove Mootness

The parties are in disagreement over which side bears the burden of proving that this action is moot. PALCO asserts that this is a case where a regulatory agency's action—the issuance of the IGP—has mooted EPIC's claims. *See* Defs.' Mot. at 7. PALCO thus submits that in order for this court to retain jurisdiction, EPIC must prove that there is a realistic prospect that the challenged activity will continue notwithstanding the fact that PALCO has obtained the IGP.[7] *See Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc.*, 138 F.3d 351, 355 (8th Cir.), *reh'g denied*, 138 F.3d 351 (8th Cir.1998). *But see Mississippi River Revival, Inc. v. City of Minneapolis*, 319 F.3d 1013, 1016–17 (8th Cir.) (holding defendants to heavy burden of establishing mootness where defendants alleged that their procurement of NPDES permits rendered plaintiffs' CWA

claims moot), *reh'g denied*, 319 F.3d 1013 (8th Cir.2003). In opposition, EPIC contends that PALCO's decision to obtain a permit should be analyzed under the voluntary cessation doctrine, which requires PALCO to prove that the challenged activity cannot reasonably be expected to recur. *See, e.g., Laidlaw*, 528 U.S. at 189, 120 S.Ct. 693.

■ Contrary to PALCO's assertion, even in cases where an agency's regulatory action may have mooted a suit, the Ninth Circuit applies the standard that the party asserting mootness bears the heavy burden of persuading the court that the case is moot. *See, e.g., Tinoqui–Chalola Council of Kitanemuk & Yowlumne Tejon Indians v. United States DOE*, 232 F.3d 1300, 1303–04 (9th Cir.2000) (requiring the defendant to prove mootness where an agency's action may have rendered the case moot). *Accord Communities for a Better Env't v. Tosco Refining Co., Inc.*, 2001 WL 114441, *4, 2001 U.S. Dist. LEXIS 1161, at *13 (N.D.Cal. January 26, 2001) (Illston, J.) (holding that defendant carries the heavy burden to prove mootness in a CWA case even where an agency's regulatory action may have rendered the case moot).

Further, even assuming, *arguendo*, that Ninth Circuit law provides for shifting the burden of proof in cases where an agency's regulatory action may have mooted a suit, the undisputed facts establish that the action that has purportedly mooted EPIC's claims—PALCO's procurement of the

---

**7.** PALCO cites to *Russian River Watershed Prot. Comm. v. Santa Rosa*, 142 F.3d 1136, 1143 (9th Cir.1998), for this proposition. PALCO's reliance on this case is mistaken. In *Russian River Watershed*, the Ninth Circuit found that appellants lacked standing under the CWA because they "did not prove the existence of ongoing violations or the reasonable likelihood of continuing future violations." *Id.* However, the Ninth Circuit's holding on the issue of standing does not

guide this court's determination of mootness. *See Laidlaw*, 528 U.S. at 191–92, 120 S.Ct. 693 (distinguishing the doctrine of standing from the doctrine of mootness). *Cf. San Francisco Baykeeper, Inc. v. Moore*, 180 F.Supp.2d 1116, 1123 (E.D.Cal.2001) (holding that it is inappropriate to apply the voluntary cessation exception to a determination of standing under the CWA, given that mootness and standing are two wholly separate jurisdictional doctrines).

IGP—is attributable to PALCO's voluntary action in response to this lawsuit. Indeed, PALCO concedes that the motivating factor behind its decision to procure the IGP was its concern that it would face civil penalties should liability be established in this action. *See* Defs.' Reply at 4. The facts thus establish that PALCO voluntarily ceased the challenged activity by obtaining the IGP for its Bear Creek operations. *See PUC v. FERC*, 100 F.3d 1451, 1460 (9th Cir.1996) (holding that "in order for this exception to apply, the defendant's voluntary cessation must have arisen *because* of the litigation." (citing *Nome Eskimo Community v. Babbitt*, 67 F.3d 813, 816 (9th Cir.1995))); *Armster v. United States Dist. Court*, 806 F.2d 1347, 1357 (9th Cir.1986) (holding that "[a] change of activity by a defendant under the threat of judicial scrutiny is insufficient to negate the existence of an otherwise ripe case or controversy [under the voluntary cessation exception to mootness]." (citations omitted)). Moreover, as discussed below, this conclusion is bolstered by the fact that the regulatory agencies responsible for implementing the NPDES program—the Regional Board and the State Board—played no role in PALCO's decision to obtain the permit.[8] *See* JSUF at 9.

### B. *Mootness Inquiry*

■ PALCO asserts that even if it bears the burden of proving that EPIC's claims are moot, the court should grant its motion for summary judgment because it has demonstrated with absolute certainty that it will not resume the allegedly illegal activity at Bear Creek. PALCO rests its argument on the assertion that "where the allegation is that of failure to obtain a permit, the procurement of a permit is sufficient to demonstrate that it is 'absolutely clear' that the alleged unlawful conduct will not recur." Defs.' Mot. at 9.

PALCO relies on *Mississippi River Revival* for the proposition that where the gravamen of a CWA plaintiff's claims is that a defendant has failed to obtain a permit for its discharges, the simple procurement of the permit is enough to prove with absolute clarity that the allegedly unlawful conduct will not recur. *See* 319 F.3d at 1016–17. Contrary to PALCO's assertion, the Eighth Circuit did not hold that the bare fact that the defendants had procured NPDES permits was enough to moot the plaintiffs' claims. *See id.* Rather, the court held that the plaintiffs' claims were moot only after finding that the defendant cities had otherwise met their burden to prove that the challenged activity could not reasonably be expected to recur. *See id.* at 1016 (holding that "there [was] no evidence that discharges without a permit [would] resume and overwhelming evidence to the contrary."). *See also Kennedy Bldg. Assocs. v. Viacom, Inc.*, 375 F.3d 731, 745–46 (8th Cir.) (explaining that in *Mississippi River Revival*, the plaintiffs' claims were moot because "the defendants were able to prove that it was absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." (internal quotation marks and citation omitted)), *reh'g denied*, 375 F.3d 731 (8th Cir.2004). Accordingly, the court finds that PALCO's procurement of the IGP—without more—is not sufficient to establish that PALCO will not resume discharging without a permit in the future.

PALCO further argues that it has carried its burden to prove mootness because the undisputed facts establish that there are "institutional controls" in place that

---

8. For the same reason, PALCO's contention that the voluntary cessation exception does not apply because PALCO cannot unilaterally resume the challenged activity, even if true, would be irrelevant given the facts of this case.

check PALCO's ability to independently resume the challenged conduct. In support of its argument, PALCO emphasizes that in order to terminate the IGP, it has to file a Notice of Termination (NOT) with the Regional Board and must abide by the IGP's terms and conditions unless and until the Regional Board approves the NOT.

IGP holders can seek to terminate their permits by submitting an NOT to their local Regional Water Quality Control Board. Defs.' Request for Judicial Notice (hereinafter "RJN"), Exh. 2 at 2. The NOT form provides, *inter alia,* that a party may seek termination of its IGP if the party believes that "[t]he facility is not required by federal regulations to be regulated by an industrial activities storm water NPDES permit." *Id.* at 3. The Regional Board instructs that this basis of termination may apply where "[a] facility operator who has filed a Notice of Intent for coverage under the General Permit ... later determines that the facility is not included in the identified categories...." *Id.* at 5–6. "Submittal of a NOT does not guarantee termination...." *Id.* at 2. Rather, the Regional Board must review and approve the NOT in order to terminate a permit. *See id.*

The NOT process does not supply meaningful protection in this case because the Regional Board—the agency responsible for reviewing and approving an NOT—has clearly stated its position that PALCO's silvicultural activities in Bear Creek do not require an NPDES permit. *See* Michael R. Lozeau Dec., Exh. G. Likewise, the State Water Board has stated that "[i]n the absence of legal authority establishing that such discharges should be regulated under the NPDES permit system, the State Board concludes that the regional boards may continue to issue waivers for discharges associated with timber harvesting...." State of California, State Water Resources Control Board Order WQO 2004, "In the Matter of the Petition of Environmental Protection Information Center and Humboldt Watershed Council," 12–13 (Apr. 6, 2004), *at* http://waterboards .ca.gov/agendas/2004/April/0422–09.doc. The State Board acknowledged this court's order of October 14, 2003, which found that ditches, culverts and other manmade conveyances extant within silvicultural operations cannot be removed wholesale from the CWA's point source classification, but determined that because this matter "is not yet resolved," this court's interpretation "has no binding legal effect on the resolution of the petitions before the State Board." *Id.* at 13 n. 15.

PALCO concedes that the Regional Board and the EPA, the agency to which the Regional Board defers, have refused to acknowledge that silvicultural operations of the type PALCO performs might require an NPDES permit despite this court's previous ruling to the contrary. *See* Defs.' Reply at 13; Lozeau Dec., Exh. G. *See also Environmental Def. Ctr., Inc.,* 344 F.3d at 863 (remanding the case to the EPA "so that it may consider in an appropriate proceeding Petitioners' contention that § 402(p)(6) requires EPA to regulate forest roads."). In light of this undisputed fact, PALCO's contention that its mootness argument should not be undermined by the fact that the Regional Board *"may some day determine* that an NPDES permit is not necessary for PALCO's operations," is disingenuous. Defs.' Reply at 3 (emphasis added). The Regional Board has already made this determination.

PALCO also submits that because it has expended time, money and resources in securing and maintaining coverage under the IGP, it therefore follows that "it is *highly unlikely* that PALCO would abandon the NPDES program at some point more than five years from now (assuming

EPIC proves the requisite 'point source' discharge and the Ninth Circuit does not reverse certain of this Court's orders)." Defs.' Reply at 12 (emphasis added). PALCO's self-serving statement falls far short of satisfying its heavy burden to "assert[ ][ ]or demonstrate[ ] that [it] will *never resume*" the challenged conduct of discharging storm water without a permit. *See Norman–Bloodsaw*, 135 F.3d at 1274 (emphasis added); *see also Concentrated Phosphate Export Ass'n*, 393 U.S. at 203, 89 S.Ct. 361 (holding that "a statement, standing alone, cannot suffice to satisfy the heavy burden of persuasion which we have held rests upon those [parties asserting mootness]." (citation omitted)). Moreover, at oral argument, PALCO conceded that if this court were to find the case moot, PALCO would likely file an NOT with the Regional Board and would encourage the Board to grant the NOT. It is not "highly unlikely" that PALCO would abandon the NPDES program if this case were to become moot.

Finally, the court finds that PALCO's persistent representations that its Bear Creek operations do not require an NPDES permit are an additional factor suggesting that there is a likelihood that PALCO will resume the challenged activity. *See Blue Ocean Pres. Soc'y*, 767 F.Supp. at 1525 (holding that "the likelihood of recurrence of challenged activity is more substantial when the cessation is not based upon a recognition of the initial illegality of that conduct." (citing *Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37, 43, 65 S.Ct. 11, 89 L.Ed. 29 (1944))). Indeed, PALCO, in the very documents it submitted to obtain permit coverage, explicitly states that "[t]he preparation and submission of these documents is not an admission that a Clean Water Act permit is required for storm water discharges associated with PALCO's timber harvesting in the Bear Creek watershed." Carr Dec.,

Exh. C at 12. In the SWPPP, PALCO further states that

the preparation and submission of the SWPPP, Monitoring Program and Reporting Requirements, and any other documents and materials related to logging within the Bear Creek watershed, and the submission of the NOI and any other documents required by this General Permit, is not an admission that PALCO is discharging pollutants from a point source to a water of the United States. These documents are submitted solely in response to the orders of the U.S. District Court for the Northern District of California in *Environmental Protection Information Center v. Pacific Lumber Co.*, et al., Case No. C01–2821 MHP.

*Id.* at 11.

PALCO's mootness argument appears to be nothing more than a subterfuge to evade this court's April 19, 2004 order denying PALCO's motion to certify three of the court's previous decisions in this matter for interlocutory review. In its moving papers, PALCO unabashedly represents that "if and when this Court's orders are reversed by the Ninth Circuit, PALCO will file an NOT and extricate itself from the IGP [Industrial General Permit] requirements." Defs.' Reply at 7. PALCO's eagerness to appeal this court's orders belies it contention that the action is moot. Indeed, the court questions how PALCO could appeal the court's previous decisions in this matter if, as PALCO asserts, the parties now lack a legally cognizable interest in the outcome of this action and the issues between them are no longer live. PALCO's position defies logic; an appellate court would lack jurisdiction over a "review on the merits of [any] adverse collateral order[s]" issued by this court prior to the case becoming moot, as there would no longer be an Article III case or

controversy. *Cf. Environmental Prot. Info. Ctr., Inc. v. Pacific Lumber Co.,* 257 F.3d 1071, 1076 (9th Cir.2001) (noting that in general, a prevailing party cannot obtain appellate review on the merits of an adverse collateral order that is entered before a case becomes moot), *remanded to* 229 F.Supp.2d 993 (N.D.Cal.2002) (Patel, J.), *aff'd,* 103 Fed.Appx. 627 (9th Cir.2004). *See also Koppers Indus., Inc. v. United States EPA,* 902 F.2d 756, 758 (9th Cir. 1990) (stating that the Ninth Circuit "lacks jurisdiction to hear moot cases." (citing *Bunker Ltd. P'ship v. United States,* 820 F.2d 308, 310 (9th Cir.1987))). This court will not countenance PALCO's thinly-veiled, and mistaken, attempt to bypass the proper channels of review. If PALCO wishes to challenge the court's decisions in this matter, it may do so after EPIC's claims have proceeded to a final decision on the merits.

Based on the foregoing, the court concludes that PALCO has failed to meet its burden to prove that the alleged violations underlying this lawsuit are unlikely to recur.

## C. *Effective Relief*

PALCO further argues that EPIC's claims are moot because the court cannot grant any effective relief to EPIC or its members. *See San Francisco Baykeeper,* 309 F.3d at 1159 (holding that "[t]o establish mootness, a defendant must show that the court cannot order any effective relief." (citations omitted)). Contrary to PALCO's assertion, the court finds that at the very least, EPIC's claim for civil penalties would remain viable if it were to prevail on the merits of its claims.[9]

If a court finds that a defendant has violated the CWA, the court may award

payment of "a civil penalty not to exceed $25,000 per day for each violation." 33 U.S.C. § 1319(d). "If civil penalties are awarded in citizen suits, they are payable not to the citizen plaintiff but to the U.S. Treasury." *San Francisco Baykeeper,* 309 F.3d at 1156 (citations omitted). In citizen suits, the imposition of civil penalties serves to "deter future violations of the Clean Water Act even when injunctive relief is inappropriate." *Ecological Rights Found. v. Pacific Lumber Co.,* 230 F.3d 1141, 1153 (9th Cir.2000) (citation omitted).

PALCO argues that EPIC's claim for civil penalties is moot because there is no evidence that PALCO will resume the allegedly unlawful behavior—operating without a permit—in the future. PALCO further asserts that the need for deterrence in the form of civil penalties is absent in the present action because PALCO cannot unilaterally terminate the IGP. Because PALCO has failed to meet its burden to prove that the allegedly unlawful activity cannot reasonably be expected to recur, it also has failed to establish that its procurement of the IGP has rendered EPIC's claim for civil penalties moot. *See San Francisco Baykeeper,* 309 F.3d at 1160 (holding that "[o]nly when it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur will events following the commencement of a suit moot a claim for civil penalties." (internal quotation marks and citation omitted)).

Additionally, the court notes that liability for civil penalties, which attaches at the time of the violation, serves an important deterrent function, especially where a party found to have violated the CWA continues to engage in the operations that gave

9. PALCO also asserts that EPIC's claims for injunctive and declaratory relief are moot. The court will revisit the nature and extent of appropriate declaratory and injunctive relief during the remedies phase of the lawsuit.

rise to the violations. *See Laidlaw,* 528 U.S. at 174, 120 S.Ct. 693; *Ecological Rights Found.,* 230 F.3d at 1153 (holding that a claim for civil penalties was not moot despite the fact that defendant operated its facilities under a new, stricter CWA permit because "[t]here [was] no basis for believing that the bare fact of a new, stricter permit makes future permit violations any less likely, deterrence any less necessary, or the deterrent effect of civil penalties any less potent."). *See also San Francisco Baykeeper,* 309 F.3d at 1160 (holding that plaintiff's claim for civil penalties was not moot even though defendant firm sold the polluting facility at issue because the "facility is still operating, and there is a possibility that violations will recur at the facility."). In the present action, PALCO continues to engage in its silvicultural operations in Bear Creek. Despite PALCO's assertion that the need for deterrence is absent here because of "institutional controls" that check its ability to resume the challenged activity, the court finds that if EPIC were to prevail on the merits, the imposition of civil penalties could serve as a powerful deterrent.

PALCO's motion for summary judgment is therefore denied.

## III. *EPIC's Cross–Motion for Partial Summary Judgment*

EPIC argues that this court should grant its motion for partial summary judgment because PALCO, as a consequence of seeking coverage under the Industrial General Permit (IGP), has conceded that it has made unpermitted discharges of storm water associated with an industrial activity from a point source into waters of the United States in violation of the CWA. EPIC contends that PALCO's admissions of liability obviate the need for EPIC to produce factual evidence establishing PALCO's alleged point source discharges. In response, PALCO asserts that the documents it filed to obtain permit coverage cannot be construed as conclusive admissions for purposes of establishing its liability under the CWA, and argues that summary judgment is inappropriate because EPIC has failed to produce evidence that PALCO has discharged storm water or pollutants from a point source into Bear Creek.

## A. *Elements of a* Prima Facie *Case Under the CWA*

██ ██ EPIC concedes that to establish a defendant's liability under the CWA, a plaintiff must establish that the defendant (1) discharged (2) a pollutant (3) from a point source (4) to waters of the United States. *See Headwaters, Inc. v. Talent Irrigation Dist.,* 243 F.3d 526, 532 (9th Cir.2001) (citation omitted). However, EPIC contends that it does not have to make this showing here because PALCO has already conceded all of the factual elements necessary for EPIC to meet its burden to prove PALCO's liability under the CWA. EPIC argues that the Notice of Intent (NOI) and Storm Water Pollution Prevention Plan (SWPPP) PALCO filed with the State Water Board constitute conclusive evidence that PALCO operates a "facility" under the permit.[10] EPIC contends that by acknowledging that it operates a "facility," PALCO also acknowledges, by definition, that it operates "con-

---

10. In the NOI filed on July 12, 2005, PALCO identified its "facility" as "Bear Creek Watershed." Carr Dec., Exh. A at 4. Section VI of the NOI requires an applicant to provide information about the waters into which a facility's storm waters flow. The NOI contains the following statement: "Your facility's storm water discharges flow: (check one) [ ] Directly OR [ ] Indirectly to waters of the United States." *Id.* PALCO checked the box labeled "directly," and identified the name of the receiving water as "Bear Creek." *Id.*

veyances," the *"sine que* [sic] *non·* of a point source under the CWA," and discharges storm water associated with industrial activity[11] to Bear Creek.[12] Pl.'s Mot. at 10. Under Ninth Circuit law, because EPIC asserts that PALCO's statements in the NOI and SWPPP are admissions of PALCO's liability, EPIC has not offered any independent factual evidence establishing that PALCO has discharged storm water associated with an industrial activity or pollutants from an identified point source into Bear Creek in violation of the CWA.

EPIC cites no authority for the proposition that documents—NOIs and SWPPPs—submitted to obtain permit coverage may be relied upon as conclusive admissions of a defendant's liability under the CWA. Rather, EPIC relies on a series of cases holding that under the CWA publicly filed reports such as Discharge Monitoring Reports ("DMRs") serve as conclusive evidence of a permittee's liability in enforcement actions, and asks the court to find these reports analogous to the documents—the NOI and SWPPP—that PALCO submitted to initiate coverage under the IGP. *See, e.g., Sierra Club v. Union Oil Co.,* 813 F.2d 1480, 1491–92 (9th Cir. 1987) (holding that required self-monitoring reports constitute conclusive evidence of an exceedance of an NPDES permit limitation), *vacated on other grounds by* 485 U.S. 931, 108 S.Ct. 1102, 99 L.Ed.2d 264 (1988); *United States v. CPS Chem. Co.,* 779 F.Supp. 437, 442 (D.Ark.1991) (stating that "[f]or enforcement purposes, a permittee's DMRs constitute admissions regarding the levels of effluents that the permittee has discharged." (citation omitted)); *Student Pub. Interest Research Group, Inc. v. Fritzsche, Dodge & Olcott, Inc.,* 579 F.Supp. 1528, 1538 (D.N.J.1984) (holding that "reports or records which are required to be kept by law, such as DMR's and NCR's, may be used as admissions to establish a defendant's liability." (citation omitted)), *aff'd* 759 F.2d 1131 (3d Cir. 1985); *Save Our Bays and Beaches v. City and County of Honolulu,* 904 F.Supp. 1098, 1138 (D.Haw.1994) (holding that a city's noncompliance reports which it submitted pursuant to the CWA "constitute admissions of noncompliance which bind the defendant in this [enforcement] proceeding.").

EPIC's argument fails initially because NOIs and SWPPPs are wholly distinguishable from DMRs. Although NOIs and SWPPPs, like DMRs, are certified as true under penalty of perjury, the similarities end there. DMRs are reports, submitted by NPDES permittees, that establish the levels of the permittees' past discharges of pollutants. *See Union Oil,* 813 F.2d at

---

**11.** EPIC asserts that to establish a violation of the CWA permitting requirements for industrial storm water discharges, EPIC must show that PALCO (1) discharged storm water (2) to navigable waters (3) from a point source. Pl.'s Mot. at 5. EPIC cites *Natural Resources Defense Council v. EPA,* 966 F.2d 1292, 1304 (9th Cir.1992), for the proposition that "[i]t is not necessary that storm water be contaminated or come into direct contact with pollutants: only association with any type of industrial activity is necessary." EPIC's reliance on this theory of liability raises other issues, which are addressed *infra* in the concluding section of this order.

**12.** The Industrial General Permit (IGP) defines a "facility" as "a collection of industrial processes discharging storm water associated with industrial activity within the property or operational unit." Defs.' RJN, Exh. 1 at 78. The IGP defines "storm water associated with industrial activity" as "the discharge from any conveyance which is used for collecting and conveying storm water and which is directly related to manufacturing, processing, or raw materials storage areas at an industrial plant. The term does not include discharges from facilities or activities excluded from the NPDES program." *Id.* at 79.

1491–92. Significantly, in each of the cases EPIC cites, there was undisputed evidence that defendants had discharged pollutants from a point source, and the only issue was whether they failed to comply with the limitations in their NPDES permits. *See, e.g., id.* at 1484 (stating that the parties did not dispute that "Union Oil operates a facility that discharges treated wastewater into the San Pablo Bay . . . ."); *see also CPS Chem. Co., Inc.,* 779 F.Supp. at 443 (stating that "[t]he facts necessary to support a finding of liability in this case are not in dispute."). In such cases, it is reasonable to preclude a permittee from impeaching its own DMRs during an enforcement proceeding because the "NPDES program fundamentally relies on self-monitoring," and "allowing permittees to excuse their reported exceedances by showing sampling error would create the perverse result of rewarding permittees for sloppy laboratory practices." *Union Oil,* 813 F.2d at 1492. In contrast to DMRs, NOIs "do not establish that any discharge has actually occurred [into navigable waters] . . . ." *Texas Indep. Producers and Royalty Owners Assoc. v. Environmental Prot. Agency,* 410 F.3d 964, 973 (7th Cir.) (holding that plaintiffs could not discharge their burden to meet the CWA's standing requirements by relying on defendant's Notice of Intent to discharge pollutants under the terms of the General Permit), *reh'g denied,* 410 F.3d 964 (7th Cir.2005). Similarly, a SWPPP is merely a "[d]ocument that contains practices and procedures that are designed in order to reduce or prevent industrial pollutants in storm water discharges." Carr Dec., Exh., C at 9. Unlike DMRs, SWPPPs do not explicitly address a permittee's past discharges of pollutants but rather detail those practices a permitee will use to prevent such discharges. *See id.*

Contrary to EPIC's assertion, the court finds that it would be illogical to impose a rule holding a party conclusively liable for unpermitted point source discharges on the sole basis of statements it made in documents submitted to obtain permit coverage. Consequently, the court finds that the NOI and SWPPP do not serve as conclusive evidence that PALCO has discharged storm water and pollutants from a point source into Bear Creek. *See Environmental Def. Ctr., Inc.,* 344 F.3d at 853 (stating that an "NOI represents no more than a formal acceptance of terms elaborated [in the CWA] . . . ."). Thus, as an evidentiary matter, EPIC cannot submit PALCO's enrollment documents in lieu of other factual evidence establishing that PALCO discharged storm water associated with industrial activity or pollutants from a point source into Bear Creek. *See Bufford v. Williams,* 42 Fed.Appx. 279, 284 n. 3 (10th Cir.2002) (holding that "to establish a violation of the Clean Water Act it is . . . necessary to put forth evidence of a point-source discharge of pollutants in the first instance.").

This holding comports with the only case this court has found in which a plaintiff offered a defendant's NPDES permit application as evidence of a defendant's liability under the CWA. *See Ohio Envtl. Council v. Vari–Seal Mfg. Corp.,* 32 Env't Rep. Cas. (BNA) 1679, 1990 WL 272729 (N.D.Ohio 1990). In *Vari–Seal Manufacturing,* the plaintiff submitted the defendant's NPDES permit application in support of its contention that the defendant discharged pollutants into navigable waters. The defendant's permit application required the defendant to answer the following question: "[i]s this a facility which currently results in discharges to waters of the U.S.?" *Id.* The defendant answered this question in the affirmative. Although the court did not explicitly state what weight, if any, it afforded this piece of evidence, it is significant that the plaintiff

also submitted other undisputed evidence, in the form of affidavits, that conclusively established that the defendant discharged pollutants from a discrete point source into navigable waters. *Id.* In contrast, in the instant matter, EPIC has proffered no evidence, aside from PALCO's permit enrollment documents, that establishes that PALCO has discharged pollutants or storm water from a discrete point source into Bear Creek.

Further, even viewing the statements in the NOI and SWPPP as admissions with some evidentiary value, the court finds that the admissions made in those documents do not establish that PALCO has discharged storm water or pollutants from a *point source* into Bear Creek. Neither the NOI nor the SWPPP submitted by PALCO identifies any discrete point sources on PALCO's Bear Creek property from which storm water or pollutants are discharged into Bear Creek. Aside from PALCO's general statement in the SWPPP that "[r]oads can be a major source of sediment input to streams, especially where they cross watercourses and when they are used during wet weather," Carr Dec., Exh. C at 24, there are no specific statements in either document establishing that PALCO operates point sources such as culverts, ditches or conduits from which storm water or pollutants are discharged into Bear Creek. EPIC simply piles inference upon inference, asserting that because PALCO, in its IGP enrollment documents, stated that it operates a "facility," it must therefore follow, by definition, that PALCO discharges storm water associated with industrial activity from "conveyances," which are used for collecting and conveying storm water. However, EPIC has not proffered factual evidence of a single point source on PALCO's property.

Although as a general matter, a "facility" permitted under the IGP is defined as "a collection of industrial processes discharging storm water associated with industrial activity within the property or operational unit," Defs.' RJN, Exh. 1 at 78, the court holds that EPIC must still put forth actual proof that PALCO has made unpermitted discharges from a discrete point source into Bear Creek. This holding comports with the fact that the CWA only imposes liability for unpermitted point source discharges. *League of Wilderness Defenders*, 309 F.3d at 1183. Therefore, the IGP obtained by PALCO only regulates point sources—to the extent they exist—from which discharges are made into Bear Creek; the IGP does not regulate any non-point source discharges. Even assuming, *arguendo*, that EPIC had established that PALCO made discharges from its Bear Creek operations, it would still be improper to impose liability on PALCO without proof of specific unpermitted point source discharges because it is impossible to discern from the record whether the alleged discharges occurred via point sources or nonpoint sources. *Cf. Idaho v. Hanna Mining Co.*, 699 F.Supp. 827, 832 (D.Idaho 1987) (holding that it would be inappropriate to impose liability on defendants where the factual record was insufficient to establish whether the damages caused by defendants' operations were due to point source discharges, which were regulated under defendants' NPDES permit, or non-point discharges), *aff'd*, 882 F.2d 392 (9th Cir.1989). *Cf. also Sierra Club v. Abston Constr. Co.*, 620 F.2d 41, 47 (5th Cir.1980) (holding that summary judgment was inappropriate where additional findings of fact were necessary to determine whether defendants' discharges occurred via point sources or nonpoint sources). Consequently, the court finds that EPIC has failed to meet its initial burden to show that PALCO has dis-

charged from a point source. Summary judgment as to PALCO's liability under the CWA is therefore inappropriate.

EPIC also argues that because PALCO "opted to enroll in a NPDES permit," it is now barred from challenging the terms of that permit in this court. Pl.'s Reply at 7. As an initial matter, the court is unable to determine from EPIC's papers how PALCO's ability to challenge the language of the IGP has any bearing on the instant motions. There is nothing in the language of the 1997 IGP that establishes that PALCO has made unpermitted discharges in violation of the NPDES and CWA requirements. In addition, as just discussed, the permit does not suffice to satisfy EPIC's burden as the party seeking summary judgment. The court need not rule on the legal merits of EPIC's claim.

EPIC's motion for summary judgment is therefore denied.

### B. *PALCO's Evidentiary Proffer*

In opposing EPIC's motion, PALCO has submitted expert declarations that appear to include legal conclusions as to the applicability of the CWA to PALCO's Bear Creek operations. For example, Dr. Pyles opines that "[o]verlaying a point source regulatory regime on PALCO's Bear Creek lands runs counter to the common understanding of non-point source management in the field of forest engineering and would be impractical and ineffectual in addressing polluted storm water runoff." Marvin R. Pyles Dec. ¶ 24. Likewise, Dr. Beschta concludes that "[f]rom a practical perspective, trying to accurately identify *a priori* which road drainage structures deliver water and sediment to a channel for possible point source permitting would seemingly represent a nearly impossible task." Robert L. Beschta Dec. ¶ 38. PALCO points out that the field observations and conclusions of Drs. Beschta and

Pyles support the EPA's determination that storm water runoff from forest roads and their associated drainage features are exempted from the NPDES permitting requirements.

The court reminds PALCO that despite its stubborn protestations to the contrary, this court has already settled the issue of whether PALCO's silvicultural operations might be subject to the provisions of the NPDES and the CWA. Indeed, the court's January 23, 2004 order provides that PALCO's point sources—to the extent they exist—must comply with the terms of the NPDES and the CWA. *Environmental Prot. Info. Ctr. v. Pacific Lumber Co.*, 301 F.Supp.2d 1102, 1113 (N.D.Cal.2004) (Patel, J.). Although PALCO has repeatedly stated that it disagrees with the court's interpretation of 40 C.F.R. section 122.7 and that it intends to appeal certain of the court's decisions in this matter, PALCO simply cannot relitigate the issue of whether its silvicultural operations are *per se* exempted from the operation of the NPDES and CWA at this stage of the litigation. *See United States v. Phillips*, 367 F.3d 846, 856 (9th Cir.) (stating that "[t]he law of the case doctrine precludes a court from reconsidering an issue that it has already resolved."), *cert. denied*, 543 U.S. 980, 125 S.Ct. 479, 160 L.Ed.2d 358 (2004). Therefore, PALCO's argument that "storm water runoff from forest roads and their associated BMP drainage features cannot be practically and effectually regulated by NPDES permitting" is irrelevant to the present motion. Defs.' Opp'n at 23. Moreover, the court finds PALCO's suggestion that the court defer to the EPA's interpretation of 40 C.F.R. section 122.7 absurd, as this court has explicitly held in its previous decisions that the EPA has misinterpreted this regulation. *See, e.g., Environmental Prot. Info. Ctr.*, 301 F.Supp.2d at 1112 n. 8 (stating that "[t]o

the extent that the alleged 'point sources' on or near Bear Creek were previously 'unregulated,' they were only so because of PALCO's—and EPA's—misinterpretation of section 122.27.").

*CONCLUSION*

For the foregoing reasons, the court hereby DENIES defendants' motion for summary judgment with respect to plaintiff's first and second claims for relief and DENIES plaintiff's cross-motion for partial summary judgment on the issue of defendants' liability.

In anticipation of further dispositive motions, the court requests additional briefing on the issue of what plaintiff must prove in order to establish defendants' liability under the CWA. More specifically, it is not clear from the record whether, as a consequence of defendants' procurement of the Industrial General Permit (IGP), plaintiff must prove that defendants (1) discharged (2) storm water associated with industrial activity (3) from a point source (4) into waters of the United States (5) without a permit, or whether plaintiff must instead prove that defendants (1) discharged (2) a pollutant (3) from a point source (4) to waters of the United States (5) without a permit. The court asks the parties to clarify this liability issue because they appear to now take positions inconsistent with their previous litigation positions in this matter. *See Environmental Prot. Info. Ctr.*, 301 F.Supp.2d at 1111–12. Indeed, EPIC's complaint alleges that PALCO's Bear Creek drainage system employs a number of point sources to redirect storm water and pollutants (i.e., something not "composed entirely of storm water") into Bear Creek. *Id.* at 1111. However, EPIC now asserts that it does not have to show that PALCO made unpermitted discharges of pollutants to carry its burden under the CWA. Likewise, PALCO also appears to have changed its position with respect to the issue of its potential liability in this matter. Although PALCO has opted to enroll its operations under the Industrial General Permit (IGP) for storm water discharges, PALCO previously claimed that its Bear Creek operations do not include storm water discharge sources associated with an "industrial" activity. *Id.* The parties are also asked to address what types of evidence plaintiff would have to proffer in order to carry its burden to prove defendants' liability under the CWA. Plaintiff shall file within ten (10) days of the date of this order a brief not to exceed 10 pages addressing these issues. Ten (10) days thereafter defendants shall respond also in a brief not to exceed 10 pages. There will be no reply briefs.

IT IS SO ORDERED.